[S.F. No. 23579. Mar. 20, 1978.]

STATE OF SOUTH DAKOTA, Petitioner, v.
EDMUND G. BROWN, JR., as Governor, etc., Respondent.

## Counsel

Gibson, Dunn & Crutcher, Charles S. Battles, Jr., and Thomas E. Holliday for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Gregory W. Baugher, Deputy Attorneys General, for Respondent.

Robert Nicco, Public Defender (San Francisco), Geoffrey Brown and Elli R. Gump, Deputy Public Defenders, Ephraim Margolin, Nicholas C. Arguimbau, Margaret C. Crosby, Alan L. Schlosser, Fred Okrand and Paul N. Halvonik, State Public Defender, as Amici Curiae on behalf of Respondent.

## Opinion

**RICHARDSON, J.**—We examine the nature of the extradition powers and duties of the Governor of California. Is a mandatory obligation to comply with the extradition demand of another state imposed upon him by either the extradition clause of the United States Constitution (art. IV, § 2, cl. 2) or the provisions of California's Uniform Criminal Extradition

Act (Pen. Code, § 1548 et seq.)? If so, may the courts of this state compel the Governor to discharge that duty? We will conclude that although the Governor's duty may be characterized as "mandatory," the judicial enforcement thereof is authorized neither by the federal Constitution nor the provisions of California's extradition act, and we will deny the petition of the State of South Dakota for a writ of mandate. (For purposes of clarity, the Uniform Criminal Extradition Act will be referred to herein as the Uniform Act, whereas California's own, slightly different version of the Uniform Act, will be referred to as the Extradition Act.)

On or about February 15, 1976, South Dakota presented an extradition demand to the Governor seeking extradition of Dennis James Banks. The demand alleged that Banks had been convicted of specified felonies in South Dakota and had fled to California while on bail. The Governor has not questioned the sufficiency of the demand nor has he expressly denied the request. Rather, he asserts that he is exercising his prerogative to "investigate" the equities of the case before acting on South Dakota's demand. South Dakota, on the other hand, insists that the Governor's extradition function is mandatory, once the conditions of the Extradition Act are satisfied, and seeks from us a writ of mandate to compel the state's Chief Executive to issue a warrant for Banks' arrest.

We emphasize at this point the very limited nature of our inquiry. We examine only the character of the Governor's extradition power, not the propriety of its exercise. Our sole function is to resolve, under applicable law, the question whether he possesses any discretionary power to refuse a demand for extradition which is in proper form. We express no opinion on the wisdom of his refusal thus far to honor South Dakota's demand under the particular circumstances of the Banks case.

As will appear, the subject of extradition is covered by both constitutional and statutory provisions which we now explore.

1. *Federal Constitution*

Article IV, section 2, clause 2, of the United States Constitution (hereafter, the Extradition Clause) provides: "A person charged in any State with treason, felony, or other crime, who shall flee from justice, and be found in another State, *shall* on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime." (Italics added.) Both the United States

Supreme Court and this court have interpreted this clause as imposing on the state executive a mandatory duty to extradite upon demand. (*Kentucky* v. *Dennison* (1861) 65 U.S. (24 How.) 66, 106 [16 L.Ed. 717, 728-729]; *Appleyard* v. *Massachusetts* (1906) 203 U.S. 222, 227 [51 L.Ed. 161, 163, 27 S.Ct. 122]; *In re Russell* (1974) 12 Cal.3d 229, 234 [115 Cal.Rptr. 511, 524 P.2d 1295].) Thus, in *Dennison, supra,* the high court first observed that the word "demand" in the constitutional provision denoted an "absolute right" to obtain extradition, thereby implying a "correlative obligation to deliver, without any reference to the character of the crime charged, or to the policy of the laws of the State to which the fugitive has fled." (65 U.S. at p. 103 [16 L.Ed. at p. 728].) The *Dennison* court characterized this constitutional duty as "ministerial," not "discretionary." (*Id.,* at p. 106 [16 L.Ed. at p. 729].)

Having so defined a governor's obligation, however, the Supreme Court further emphasized that neither the Extradition Clause nor the federal legislation implementing it contained any procedure whereby a governor's extradition duty might be judicially compelled. (*Id.,* at pp. 107-110 [16 L.Ed. at pp. 729-730].) As *Dennison* carefully explained, "The performance of this duty . . . is left to depend on the fidelity of the state executive to the compact entered into with the other states when it adopted the Constitution of the United States, and became a member of the Union. . . . [¶] [*I*]*f the governor . . . refuses to discharge this duty, there is no power delegated to the general government, either through the judicial department or any other department, to use any coercive means to compel him.*" (*Id.,* at pp. 109-110 [16 L.Ed. at p. 730], italics added.)

Subsequently, in *Taylor* v. *Taintor* (1872) 83 U.S. (16 Wall.) 366, 370 [21 L.Ed. 287, 290], the high tribunal reaffirmed *Dennison,* acknowledging very explicitly that "If [the Governor] refuse [to extradite a fugitive], there is *no means of compulsion.*" (Italics added.)

South Dakota does not challenge the continuing force of these two Supreme Court expressions which are more than one hundred years old. It is generally accepted that federal courts lack any authority to compel a governor to deliver up a fugitive to a demanding state. Petitioner, however, would confine application of *Dennison* to the exercise of *federal* power. Relying on the rule, well established in California, that mandamus will issue to compel performance of a Governor's ministerial duties (e.g., *Hollman* v. *Warren* (1948) 32 Cal.2d 351, 354-355 [196 P.2d 562]; *Jenkins* v. *Knight* (1956) 46 Cal.2d 220, 222-223 [293 P.2d 6]), South

Dakota argues that a *state* court may enforce the mandate of the Extradition Clause. In this connection, however, petitioner has neither cited, nor have we found, a single case in the history of the Republic in which *any* state court has issued mandamus to compel extradition. We may not lightly ignore this fact. The absence of such authority appears to reflect the uniform acceptance of the highest state courts that, following *Dennison* and *Taylor,* without any specific implementing legislation, the constitutional duty of the state executive to extradite a fugitive is not judicially enforceable by either federal or state sanction. Indeed, courts from several of our sister states have expressly so held. (See *People* v. *Millspaw* (1939) 257 App.Div. 40 [12 N.Y.S.2d 435, 437] [citing *Dennison* and *Taylor*], revd. on other grounds 281 N.Y. 441 [24 N.E.2d 117]; *Carpenter* v. *Lord* (1918) 88 Ore. 128 [171 P. 577, 578]; *Ex Parte Wallace* (1951) 38 Wn.2d 67 [227 P.2d 737, 738].)

The California law on the point was established very early by a case which, although it was decided before both *Dennison* and *Taylor,* nonetheless anticipated their results and clearly recognized that in California mandate would not lie to order compliance with the constitutional obligation to extradite. (*In re Manchester* (1855) 5 Cal. 237.) As we observed in *Manchester, "the Courts of the State possess no power to control the Executive discretion, and compel a surrender* [of a fugitive] ...." (P. 238, italics added.) Even though subsequent cases, cited above, have characterized the Governor's constitutional duty as "mandatory," none of them has suggested that the obligation contained in the federal Constitution is judicially enforceable. No implementing legislation either mandated or authorized any enforcement procedure. The recognition of this fact is not new, but was stressed shortly after California's adoption of the Uniform Act by our esteemed colleague, Justice Mosk, then secretary for Governor Culbert Olson with responsibilities for the conduct of extradition hearings. Writing in the April 1939 issue of the State Bar Journal in reference to the extradition language of the federal Constitution, Justice Mosk noted that "although its provisions are mandatory upon the executive authority of each state, they were not made self-executing." (Mosk, *Extradition Procedure in California* (1939) 14 State Bar J. 121.) He observed that the varying provisions of state statutes handicapped the administration of criminal justice and ultimately prompted the adoption of the Uniform Act. (*Ibid.*) As developed more fully below, the author concluded that, by reason of the *Dennison* decision, the Governor, not the courts, has the "final authority" in extradition matters. (*Id.,* at p. 125.)

■ From all of the foregoing we conclude that while the federal Constitution imposes upon the Governor a mandatory obligation to extradite a fugitive to a demanding state, the Constitution does not empower the courts, federal or state, to enforce that duty by writ of mandate. No case has so held. Rather, the Constitution leaves the faithful execution of the extradition obligation in the hands of the state executive, trusting, in the words of *Dennison,* in the Governor's "fidelity" to the federal Constitution.

## 2. *California's Extradition Act*

If the United States Constitution creates no judicially enforceable duty to extradite a fugitive to a demanding state, is there any independent basis for such an obligation? South Dakota contends that the provisions of our state Extradition Act impose such a judicially enforceable responsibility. For reasons which we explain below, the Extradition Act, when read as a whole and examined within its historical context, does not support such an interpretation.

■ It is well established that states may agree among themselves to deliver up persons whose rendition is not required by the Extradition Clause (*Innes* v. *Tobin* (1916) 240 U.S. 127, 134-135 [60 L.Ed. 562, 565-566, 36 S.Ct. 290]), and to extradite persons within that provision on terms less exacting than those established by federal implementing legislation (*In re Morgan* (1966) 244 Cal.App.2d 903, 910 [53 Cal.Rptr. 642]). Uniform laws to accomplish this purpose, such as the Uniform Act, do not offend the clause which was not intended to limit the right to extradition. (*New York* v. *O'Neill* (1959) 359 U.S. 1, 10-11 [3 L.Ed.2d 585, 591, 79 S.Ct. 564].) ■ We accordingly inquire, did the California Legislature in adopting the Extradition Act intend to impose upon the Governor a judicially enforceable duty to extradite?

As originally proposed, section 7 of the Uniform Act read in part: "If the Governor decides that the demand should be complied with, he shall sign a warrant of arrest . . . ." (11 U. Laws Ann., p. 180.) California, alone among the adopting states, modified the above language to read: "If a demand conforms to the provisions of this chapter, the Governor . . . shall sign a warrant of arrest . . . ." (Pen. Code, § 1549.2; for enactments of other states, see 11 U. Laws Ann., *supra,* p. 181.) We are urged by petitioner to interpret this revision as an expression of legislative intent to deprive the California Governor of any and all discretion and to make

his duty to issue an extradition warrant a purely ministerial act which is subject to judicial enforcement.

The principal difficulty with the South Dakota argument is that the language of the Extradition Act (and of previous California extradition statutes) closely conforms to the language of the Extradition Clause itself, which has long and consistently been interpreted as imposing a duty which, despite its apparent "mandatory" nature, has not been judicially enforceable.

California's original extradition statute was enacted in 1851. It provided, in language substantially similar to the Extradition Clause, that "A person charged in any State or Territory of the United States, with treason, felony, or other crime, who shall flee from justice, and be found in this State, *shall* on demand of the executive authority of the State or Territory from which he fled, be delivered up by the Governor of this State, to be removed to the State having jurisdiction of the crime." (Stats. 1851, ch. 29, § 665, p. 286, italics added.) As previously noted, in 1855 we recognized that, notwithstanding this mandatory language, state courts had no power to control the Governor's discretion in extradition matters. (*In re Manchester, supra,* 5 Cal. 237, 238.) Although in *Manchester* we did not expressly refer to the state's 1851 extradition statute, we did refer to the federal Extradition Clause and implementing statutes which contained substantially identical language.

In 1872 the extradition provisions were rephrased and renumbered as part of the formal codification of California's Penal Code. The references to "territories" were omitted, and the words "shall on demand" were deleted in favor of the words "must, on demand." (Pen. Code, former § 1548.) We attach little, if any, significance to the statutory substitution of the term "must" for "shall." Of considerably greater import, in our view, is the fact that the language of the 1872 statute was adopted by the Legislature 10 years after the United States Supreme Court's expression in *Dennison, supra,* 65 U.S. (24 How.) 66, that the Governor's duty was unenforceable by the *federal* courts, and 16 years after our own pronouncement in *In re Manchester, supra,* 5 Cal. 237, that our *state* courts are not empowered to control executive discretion in extradition matters. Presumably, the Legislature in 1872 knew of both the *Dennison* and *Manchester* interpretations. Furthermore, the 1872 Penal Code specifically provided that, "The provisions of this Code, so far as they are substantially the same as existing statutes, must be construed as *continuations* thereof, and not as *new* enactments." (Pen. Code, § 5,

italics added.) In accordance with well settled rules of statutory construction (see, e.g., *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688-689 [8 Cal.Rptr. 1, 355 P.2d 905]) it is reasonable to conclude that former section 1548, therefore, should be interpreted as incorporating those judicial limitations articulated in both *Dennison* and *Manchester,* thereby perpetuating a measure of executive discretion in extradition matters, free of judicial control.

California's extradition statutes remained substantially unchanged until the Uniform Act was adopted (with some modifications) in 1937. (Stats. 1937, ch. 554, p. 1581.) As we have related above, our Extradition Act now provides that "If a demand conforms to the provisions of this chapter, the Governor . . . shall sign a warrant of arrest . . . ." (Pen. Code, § 1549.2; see also § 1548.1 ["duty" of Governor to extradite].) This language, although phrased in mandatory terms, is once again substantially similar to the language of the Extradition Clause and the earlier California extradition statutes previously described. In *Dennison,* the high court, in examining similar language, specifically noted that although Congress, in federal implementing legislation, had provided that "It shall be the duty" of the Governor to extradite a fugitive on demand, nevertheless ". . . the court is of the opinion, the words 'it shall be the duty' were not used as mandatory and compulsory, *but as declaratory of the moral duty* which this compact [between the States] created, when Congress had provided the mode of carrying it into execution. The act does not provide any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the Executive of the State . . . ." (*Dennison, supra,* 65 U.S. at p. 107 [16 L.Ed. at p. 729], italics added; see also *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 573 [203 P.2d 758] [whether a statute was intended as mandatory or directory cannot be determined solely from its language that certain formalities "shall" be followed].)

Similarly, the Extradition Act (as well as earlier versions of California extradition statutes), though phrased in mandatory language, contains no procedure whatever by which the Governor's duty may be judicially enforced. Moreover, no source of legislative history has been cited, and none has been found, which even remotely suggests that the purpose of the Legislature's adoption of the Extradition Act in 1937 was to change the long-standing preexisting rule (*In re Manchester, supra,* 5 Cal. 237, 238) that state courts may not enforce the Governor's extradition duties. It seems logical to conclude that if such a radical departure from existing

law was intended, the Legislature would have made such intent abundantly clear either by directly circumscribing the exercise of executive discretion or by authorizing increased judicial participation in and review of the extradition process. Instead, the Legislature readopted language bearing an historic interpretation precluding judicial enforcement.

■ We have said, as a general rule, that when the Legislature enacts a law "framed in the identical language" of a previous law on the same subject, it is presumed that the new law has the same fundamental meaning as the old law. (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen, supra,* 54 Cal.2d 684, 688-689.) While the language of the Extradition Act is not "identical" with that of earlier statutory language, it is substantially similar. In view of the context in which Penal Code section 1549.2 was enacted, logic suggests that this provision receive a construction which continues the preexisting interpretation of judicial restraint or abstention in extradition matters. It is likely that the Legislature chose to frame the obligation to extradite in mandatory terms in order to avoid the appearance of inconsistency with prior federal and state law, and to emphasize the Governor's high obligation to carry out the extradition laws. We find nothing whatever in the legislative history of section 1549.2, ancient or recent, which suggests that the Legislature intended to authorize judicial enforcement of extradition demands.

The validity of the foregoing interpretation is reinforced by an examination of other provisions of the Extradition Act. In this connection we are aided by two general rules of statutory construction. We have held that "a statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts . . . ." (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; accord *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617]; *County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526].) ■ Furthermore, in ascertaining the legislative intent underlying the extradition statutes, we must concentrate upon the " 'general tenor and scope of the entire scheme embodied in the enactments' " rather than upon the " 'exact phraseology in which the intent has been expressed . . . .' " (*In re Morgan, supra,* 244 Cal.App.2d 903, 910.)

Penal Code section 1554, unamended since its enactment, was taken verbatim from section 21 of the Uniform Act. (11 U. Laws Ann., *supra*, at p. 277.) The section provides that "The Governor *may recall* his warrant of arrest or may issue another warrant *whenever he deems it proper.*" (Italics added.) Clearly, a construction of the act which imposes on the Governor a judicially enforceable duty to issue an extradition warrant while, at the same time, conferring upon him absolute discretion to recall his warrant would create absurd results. It is a fundamental rule of statutory construction that statutes should be construed to avoid anomalies. (See *People* v. *Oliver* (1961) 55 Cal.2d 761, 767 [12 Cal.Rptr. 865, 361 P.2d 593].) Recognizing this problem, South Dakota urges us to interpret section 1554 as *procedural* in nature, thus allowing the Governor to withdraw his warrant only if it is no longer necessary or if it contains some formal or procedural defect. Such an interpretation, however, strains the statutory language which, using general terms, expressly and without apparent limitation states that the Governor may recall the warrant "whenever he deems it proper."

It is further argued that section 1554 is inapplicable to warrants issued by the Governor in response to extradition demands from another state. Instead, it is urged, section 1554 concerns only the recall of warrants which are issued by the Governor to secure a fugitive received *from* another state in response to *California's* extradition demand. In other words, it is contended that while the Governor may, at will, revoke a warrant issued in support of extradition *to* California he may not do so in cases of extradition *from* this state. A close examination, however, of the provisions of the Extradition Act readily refutes this contention.

As we have previously noted, section 1549.2 of the Extradition Act (derived from § 7 of the Uniform Act) directs the Governor to issue an arrest warrant once a proper demand has been received from another state. This section, and (with one exception) all other sections of the act which precede section 1554, relate to the subject of compliance with out-of-state extradition demands. (Section 1549 allows the Governor by agreement with another state to accomplish extradition to California despite the pendency of criminal proceedings in the other state.) It seems readily apparent that, using a common sense approach, the phrase "his warrant of arrest" in section 1554 (§ 21 of the Uniform Act) must refer to the arrest warrant specified in the preceding section 1549.2 (see also §§ 1549.3-1550.3, 1552-1552.2). We also observe that the subject of demanding extradition *to* California (and the issuance of an arrest warrant upon delivery of the fugitive *to* California) first appears in a *subsequent* sec-

tion of the act (§ 1554.1; § 22 of the Uniform Act). If South Dakota's construction of legislative intent is accepted, this would seem an odd placement and an unusual statutory sequence. One would reasonably anticipate that the subject of the recall of a warrant (§ 21 Uniform Act; Pen. Code, § 1554) would *follow* rather than *precede* the substantive discussion of the warrant (§ 22 Uniform Act; Pen. Code, § 1554.1 et seq.). Although section 1554 may arguably apply to both extradition to and from California, a point we need not now decide, we discern no reason whatever for limiting the application of the section to California's demands of extradition from other states. Our research discloses only one case interpreting section 21 of the Uniform Act (Pen. Code, § 1554) and it assumed, as we do, that the section applies to the extradition demand of another state. (See *Ex Parte Oxford* (1953) 158 Tex.Crim. 435 [256 S.W.2d 105, 106].)

In addition to section 1554, another provision of the Extradition Act also strongly suggests a legislative intent to confer some degree of discretion upon the Governor in acting in response to extradition demands. Section 1548.3, unamended since its adoption, is substantially similar to section 4 of the Uniform Act. (11 U. Laws Ann., *supra,* p. 154.) Section 1548.3 provides that "When a demand is made upon the Governor of this State by the executive authority of another State for the surrender of a person so charged with crime, the Governor may call upon the Attorney General or any district attorney in this State to investigate or assist in investigating the demand, and to report to him the situation and circumstances of the person so demanded, and whether he ought to be surrendered according to the provision of this chapter."

It would seem reasonable to conclude that if the Governor's only duty in extradition matters was to determine the adequacy of the extradition papers, the Legislature in adopting section 1548.3 logically would have limited the authority of the Attorney General or district attorney to the investigation of the formal sufficiency of the demanding papers and to report simply whether extradition was required. Instead, the statute authorizes a broader investigation into the "situation and circumstances of the person" and a recommendation as to whether the fugitive *"ought* to be surrendered." (Italics added.) These provisions would appear to be pure surplusage if the Governor's duty was solely a ministerial one of surrendering the fugitive whenever the papers are found to be in proper order and the person sought is properly identified. But, we have held that " 'A cardinal rule of construction is that . . . a construction making some words surplusage is to be avoided.' " (*People* v. *Gilbert* (1969) 1 Cal.3d

475, 480 [82 Cal.Rptr. 724, 462 P.2d 580].) Application of such a rule favors the Attorney General's claim of gubernatorial discretion.

Pointing to other sections of the Extradition Act, South Dakota reminds us that, in contrast to the *mandatory* language of section 1549.2, discussed above, the sections of the act which govern cases of extradition falling *outside* the Extradition Clause are framed in permissive terms. These provisions specify that the Governor "may" extradite a fugitive in those cases in which he has left the demanding state involuntarily (§ 1549), or was not present in the demanding state when he caused a crime to be committed therein (§ 1549.1), or is awaiting trial in this state (§ 1553.1). The inference suggested by this argument is that the Legislature having expressly used the term "may" in describing certain discretionary extradition situations must thereby have meant that the term "shall" imposed a mandatory duty on the Governor. Sections 1549, 1549.1, or 1553.1, however, are in no way inconsistent with the premise that section 1549.2 was not intended to create a *judicially enforceable* duty to extradite. The foregoing provisions pertain to special factual circumstances in which, by their very nature, extradition may not be appropriate. The Legislature, accordingly, would have had no reason in such cases to have adopted language reflecting any constitutionally imposed duty to extradite.

We are moved to our conclusion herein by another factor of considerable force. We have held that ". . . the contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." (*City of Los Angeles* v. *Rancho Homes, Inc.* (1953) 40 Cal.2d 764, 770-771 [256 P.2d 305].) ■ Our interpretation of the Extradition Act is supported by the contemporaneous construction of a succession of former California Governors of which construction we may take judicial notice (Evid. Code, § 452, subd. (c)). The Attorney General has represented to us, citing examples, and without challenge, that Governors Olson, Knight, Brown, Sr., Reagan, and Brown, Jr., for varying reasons have declined to honor extradition requests which have been in proper form.

We are able to document that the foregoing practice has extended almost 40 years because again we find that Justice Mosk identified, in his careful analysis written in 1939, the kind of case invoking gubernatorial discretion. He observed that "Occasionally there arises an exceptional

case in which the ends of justice require particular consideration." (Mosk, *supra,* 14 State Bar J. at p. 125.) He cited the example of an escapee from custody in a southwestern state who for a period of 17 years led a blameless life, and concluded that "it would seem to have been a miscarriage of justice to have returned him to the demanding state." Governor Olson declined to return him. Doubtless, it was this conclusion that prompted the editors of the State Bar Journal to preface the article with the headnote "Governor can prevent miscarriage of justice by refusing extradition." In the same vein the article continues, "That raises the question of whether or not a governor may be compelled to return a fugitive when he thus arbitrarily determines against so doing. No cases have arisen in California, but *the issue was decided* in an early federal case, *Ex Parte Kentucky* v. *Dennison* . . . ." (*Ibid.,* italics added.) Following a quotation from *Dennison,* and noting that as a practical matter former California Governors had complied with the federal and state Constitutions, Justice Mosk concludes: "*Thus it would appear that the executive, in the last analysis, has the final authority in determining his duty in extradition problems.*" (*Ibid.,* italics added.) Our interpretation is not new.

The general acceptance of the practice of a succession of California Governors who, since Governor Olson, have on occasion, wisely or unwisely, declined to honor extradition demands is "entitled to great weight." (*City of Los Angeles* v. *Rancho Homes, Inc., supra,* 40 Cal.2d at p. 770.) This uniform practice over many years is a factor which favors its preservation. While in no sense either controlling or persuasive because of differing constitutional and statutory language, we note that indeed this practice is indulged by our sister states and is apparently reciprocal, for the Attorney General represents to us that during the period 1959 to 1976, 84 separate requests by the California Governor for extradition *to* California of fugitives were declined by the governors of other states.

We note additionally similar evaluations which have been made by legal writers. Thus the author of 2 California Criminal Law Practice (Cont.Ed.Bar 1969) in section 27.11, at page 722, concludes that "no power exists to compel the governor to [extradite] . . . ." While describing a California Governor as lacking "true discretionary power" to decline extradition, nevertheless ". . . resisting extradition is neither a hopeless fight nor a meaningless gesture. There is occasionally an exceptional case in which counsel can clearly demonstrate that ordering return of the fugitive to the demanding state would amount to a gross miscarriage of justice. This is the case that should be presented to the governor for his

consideration through an extradition hearing." (*Id.,* § 27.26 at p. 730; see also Note, 2 Lincoln L.Rev. (1966) 48, 51-52, fn. 14; Note, 66 Yale L.J. (1956) 97, 106 and fn. 47, 107-109; 31 Am.Jur.2d, Extradition, § 48, pp. 956-957.)

Finally, several considerations of public policy support and commend an interpretation of the Extradition Act permitting the Governor to exercise some discretion in refusing extradition in an appropriate case. Doubtless, individual circumstances surrounding extradition demands are varied and diverse, thus rendering peculiarly inappropriate the mechanical application of fixed and absolute rules if justice is to be achieved in a particular case. It would be a harsh rule that stripped the Governor of all power to deny extradition in a case in which, for example, the Governor is satisfied that a fugitive, since residing in California, has established himself as a worthy law-abiding citizen, or in which his physical safety or right to a fair trial cannot be assured in the demanding state, or the offense charged does not constitute a crime in California. In a given case, various unanticipated equitable considerations may be paramount. As the Attorney General has properly urged in his brief before us, discretion is the technique by which the law guarantees that the application of norms will, in fact, achieve the objectives for which they were designed.

In 1960, former Chief Justice Traynor wisely observed that "Protection from unjustified extradition does not lie in reading into the extradition laws purely technical requirements . . . *but in the sound judgment of the respective Governors charged with the administration of those laws.* Their judgment is entitled to great weight." (*In re Cooper* (1960) 53 Cal.2d 772, 779 [3 Cal.Rptr. 140, 349 P.2d 956], italics added.) We are satisfied that such an observation retains its essential validity today, and that as a matter of public policy courts may not enforce the Governor's duty to comply with extradition demands. Although that duty may be considered mandatory in nature under the constitutional and statutory provisions discussed above, in unusual cases a potential miscarriage of justice may call for that discretionary exercise of "sound judgment." We would not serve the ends of justice if we attempted judicial interference with the Governor's discretion. We do not discuss here the extent to which the Governor's final action may be reviewable for abuse of discretion. ·

██ Having determined that the Governor possesses discretionary power to refuse an extradition demand, we conclude by observing that the Governor does have an obligation enforceable by mandamus to

exercise that discretion, either by granting or denying South Dakota's demand. (See *Anderson* v. *Phillips* (1975) 13 Cal.3d 733, 737 [119 Cal.Rptr. 879, 532 P.2d 1247]; *Hollman* v. *Warren, supra,* 32 Cal.2d at p. 355.) The demand was presented to the Governor on February 15, 1976, and since that date the matter presumably has been under the Governor's investigation and subject to the present litigation. No principle of law applicable to the case justifies a refusal by the Governor, within a reasonable time, either to grant or deny the demand properly before him. Faced with such a demand the Governor may say yes or no. What he may not do is say nothing.

The alternative writ of mandamus is discharged and the petition for a peremptory writ is denied.

Tobriner, Acting C. J., Manuel, J., Newman, J., and Racanelli, J.,* concurred.

**MOSK, J.**—I dissent.

Dennis James Banks was convicted, after a jury trial in the Circuit Court, Seventh Judicial Circuit, South Dakota, on July 25 and 26, 1975, of riot while armed with a dangerous weapon and assault with a dangerous weapon without intent to kill. On July 26 Banks posted a bond, approved by the circuit court judge, in the sum of $10,000, in which he agreed in writing to return to the court for sentencing on August 5, 1975, upon the express condition, inter alia, that he "shall not travel out of the state for any purpose." On August 5, 1975, he failed to appear in court, the bond was forfeited and a bench warrant was issued for his arrest and detention. Upon the subsequent apprehension of the fugitive in California, his extradition was requested by the Governor of South Dakota on February 9, 1976. In the more than two years thereafter, the Governor of California has taken no action on the request.

Thus the people of California now have at large in their midst a fugitive convicted felon solely because the Governor of this state has failed to fulfill the extradition duty imposed upon him by the Constitu-

*Assigned by the Acting Chairperson of the Judicial Council.

tion of the United States (art. IV, § 2, cl. 2) and by the laws of the State of California (Pen. Code, § 1548 et seq.). Whether that duty is mandatory as I believe, or discretionary as argued by the majority, is currently of little more than academic interest. The Governor has failed *either* to satisfy his mandatory duty or to exercise his purported discretion. For more than two years he has done absolutely nothing in response to South Dakota's extradition demand. This inaction constitutes a contemptuous rebuff to the administration of justice in a sister state and a blow to cooperative law enforcement among the states.

I

There is no question that a writ of mandate will lie to compel a Governor to perform a ministerial duty imposed upon him by law. As pointed out in *Jenkins* v. *Knight* (1956) 46 Cal.2d 220, 223 [293 P.2d 6], a series of cases extending back a century have been "based on the fundamental principle that under our system of government no man is above the law. Chief Justice Stephen Field, speaking for the court in the early case of *McCauley* v. *Brooks,* 16 Cal. 11, 54-55, stated that where no discretion exists and a specific legal duty is imposed, ministerial in its character, an officer of the executive department of government, like any other citizen, is subject to judicial process and that, if this were not so, the government would cease to deserve the 'high appellation' of being a government of laws."

Chief Justice Marshall put the subject in perspective in *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 170 [2 L.Ed. 60]: "It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined."

*Kentucky* v. *Dennison* (1861) 65 U.S. (24 How.) 66 [16 L.Ed. 717], invariably cited in extradition cases, does not hold to the contrary. *Dennison* is merely authority for the proposition that under our federal system of government, federal courts cannot direct governors of sovereign states to comply with their duty.[1] A similar result was reached in *Taylor* v. *Taintor* (1872) 83 U.S. (16 Wall.) 366 [21 L.Ed. 287]. But

---

[1]There is serious question whether the rigid federalism of *Dennison* would be followed today when a constitutional issue is involved. The high court has not hesitated to order state and local officials to comply with constitutionally required school desegregation (see, e.g., *Brown* v. *Board of Education* (1955) 349 U.S. 294 [99 L.Ed. 1083, 75 S.Ct. 753]; *Green* v. *County School Board* (1968) 391 U.S. 430 [20 L.Ed.2d 716, 88 S.Ct. 1689]).

*Dennison* and its progeny also emphasized the mandatory nature of the extradition clause of the United States Constitution, and it did not purport to deny to the states their right to compel state governors to adhere to constitutional and statutory commands.

In a consistent line of cases, this court has maintained the right to direct a Governor to perform his prescribed duties. Just as Governor Knight was involved in *Jenkins* v. *Knight, supra,* 46 Cal.2d 220, so were Governors Haight, Pardee and Warren in *Harpending* v. *Haight* (1870) 39 Cal. 189, 212-213, *Elliott* v. *Pardee* (1906) 149 Cal. 516, 520 [86 P. 1087], and *Hollman* v. *Warren* (1948) 32 Cal.2d 351, 354 [196 P.2d 562]. In *Hollman* we held it to be "settled in this state that in an appropriate case a writ of mandate will issue against the governor of the state [citations]."

## II

The majority concede that every provision of the Constitution and laws relating to extradition speaks in mandatory terms. The federal Constitution provides that "A person charged in any State with treason, felony, or other crime, who shall flee from justice, and be found in another State, *shall* on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime." (Italics added; U.S. Const., art. IV, § 2, cl. 2.) Over a century ago the United States Supreme Court characterized this requirement as merely "ministerial," not "discretionary" (*Dennison, supra,* 65 U.S. at p. 106 [16 L.Ed. at p. 729]). In *Drew* v. *Thaw* (1914) 235 U.S. 432, 439-440 [59 L.Ed. 302, 307, 35 S.Ct. 137], Justice Holmes declared that "The Constitution . . . peremptorily requires that upon proper demand the person charged shall be delivered up to be removed to the state having jurisdiction of the crime. [Citations.] *There is no discretion allowed,* no inquiry into motives. [Citations.]" (Italics added.)

The courts of California have declared that it "is now settled that extradition under the terms of the federal Constitution [citations] is an absolute duty and right. It is not a matter of mere comity, subject to the pleasure of each state." (*In re Morgan* (1966) 244 Cal.App.2d 903, 910 [53 Cal.Rptr. 642].)

This court, in a unanimous opinion (*In re Russell* (1974) 12 Cal.3d 229, 234 [115 Cal.Rptr. 511, 524 P.2d 1295]), explained the underlying concept of interstate rendition, more commonly known as extradition: "More-

over, extradition is not a matter of mere comity, but an absolute right of the demanding state and duty of the asylum state under the federal Constitution. [Citation.] 'Such is the command of the supreme law of the land, which may not be disregarded by any State. The constitutional provision relating to fugitives from justice, as the history of its adoption will show, is in the nature of a treaty stipulation entered into for the purpose of securing a prompt and efficient administration of the criminal laws of the several States—an object of the first concern to the people of the entire country, and which each State is bound, in fidelity to the Constitution, to recognize. A faithful, vigorous enforcement of that stipulation is vital to the harmony and welfare of the States. And while a State should take care, within the limits of the law, that the rights of its people are protected against illegal action, the judicial authorities of the Union should equally take care that the provisions of the Constitution be not so narrowly interpreted as to enable offenders against the laws of a State to find a permanent asylum in the territory of another State.' [Citations.]'"

All the expressions employed by the foregoing and other cases—ministerial, duty, right, absolute right, shall, not a matter of comity, not subject to pleasure—clearly connote a mandatory rather than discretionary responsibility.

The majority strain mightily, in reading California code sections relating to extradition, to find a legislative intent to give discretion to the Governor. The hurdle they cannot leap, however, are the express terms of Penal Code section 1549.2—"If a demand conforms to the provisions of this chapter, the Governor . . . *shall* sign a warrant to arrest . . ."—and Penal Code section 1548.1—"it is the *duty* of the Governor of this State to have arrested and delivered up to the executive authority of any other State any person charged in that State with treason, felony, or other crime, who has fled from justice and is found in this State." (Italics added.)

Seeking statutory comfort anywhere possible, the majority attempt to draw solace from Penal Code section 1554, which provides "The Governor may recall his warrant of arrest or may issue another warrant whenever he deems it proper." They find that isolated use of the permissive "may" to be significant. Their misinterpretation is understandable due to inept placement of several code sections, but nevertheless my colleagues are clearly in error.

Three related and numerically compatible code sections—1554, 1554.1 and 1554.2—all apply to the efforts of the Governor to return from another state a fugitive *from* California. Section 1554 gives the Governor authority to recall his warrant directed to the demanding state; section 1554.1 describes the method of issuing that warrant to his agent for receipt of the fugitive in the other state, and section 1554.2 provides the method of requisitioning a fugitive from a foreign state.

The majority clearly misread those three interrelated code sections when they apply any one of them to fugitives found within California. The history of the sections confirms the contrary interpretation. As originally enacted in 1872, former section 1554 enumerated the procedures to be followed by a district attorney upon learning that a fugitive from California justice has been apprehended in another state. In 1937, the old section 1554 was fractured and replaced by three sections—now 1554, 1554.1 and 1554.2—relating to the same subject, extradition to California from other states. The three sections were adopted simultaneously. (Stats. 1937, ch. 554, §§ 24, 25 & 26, pp. 1587-1588.)

As a result of finding gubernatorial discretion where none exists constitutionally or statutorily, the majority permit sanctuary to be accorded the convicted felon who is the fugitive in this case. Beyond that immediate result, however, the ultimate cost of the majority opinion is high in terms of judicial recognition and acquiescence in the unlimited exercise of discretion in an area in which discretion has been rejected by the very legislation under which the executive purports either to act or to refuse to act.

### III

It was generous and flattering of the majority to liberally quote from my 1939 article in 14 State Bar J. 121. But, alas, they overlooked the key paragraph in my discussion of gubernatorial extradition hearing procedures. I pointed out that "The issues involved are confined within narrow limitations. The executive may not inquire into the innocence or guilt of the accused, nor may he receive testimony relative to the character of the crime, the motives underlying the demand, technical defects in the indictment or information, nor the criminal liability of the accused. He is bound to consider but three issues: first, that a crime was committed in the demanding state and that the fugitive was present in said state at the time of the commission of said crime; second, that the fugitive thereafter

fled from the demanding state and is now in custody in this state; and third, that the papers are in the correct form." (*Id.* at p. 122.)

The majority deem it significant that previous California governors have declined to grant extradition. It is true that there have been a few instances over the decades in which former governors have refused to honor extradition warrants from other states. Such examples are not helpful as precedent here for two reasons. First, no negative action of previous governors has ever been challenged in court; thus there is no judicial precedent. Second, previous governors candidly confessed their denial of extradition was contrary to constitutional and statutory expectation, but out of human compassion in unusual circumstances they chose to violate their duty.[2] Here the Governor has failed to make that kind of forthright decision; he has declined to act in any manner.

I find difficulty in reconciling the vigor with which my learned colleagues enforce judicial orders directing the legislative branch of government to follow the law, and their reticence to require the executive to do likewise. For example, in *Ross* v. *Superior Court* (1977) 19 Cal.3d 899 [141 Cal.Rptr. 133, 569 P.2d 727], the majority, not even momentarily deterred by separation of powers arguments, upheld a punitive order directed to an entire legislative body for its failure to comply with a court order. (Also see *Glendale City Employees' Assn. Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328 [124 Cal.Rptr. 513, 540 P.2d 609].) The majority held—erroneously, I believe—compulsion on a board of supervisors to enact an ordinance to be merely ministerial and they proceeded to fire their heaviest artillery when the legislative body balked: a contempt citation.

We do not have a contempt proceeding here. If the Governor were to be cited for contempt, I would probably invoke Chief Justice Marshall's admonition to use restraint, not coercion (*Ogden* v. *Saunders* (1827) 25 U.S. (12 Wheat.) 213, 351 [6 L.Ed. 606, 654] (dis. opn.)). But ultimate abstention from use of the draconian remedy of contempt should not deter us from pointing out to the state's chief executive officer his clear and unmistakable duty, in the same firm manner in which this court has spoken to legislative bodies.

---

[2]In California history there have been a few such compassionate refusals (Mosk, *Extradition Procedure in California* (1939) 14 State Bar J. 121, 125). In those "exceptional" instances, the Governors of California realized they were failing to meet their extradition obligations and forthrightly explained their reasons in a communication to the Governor of the demanding state.

IV

The position of the Governor that he, and he alone, may determine whether to comply with the legal process of extradition is comparable to the claim of immunity from judicial process asserted in *United States* v. *Nixon* (1974) 418 U.S. 683, 708-709 [41 L.Ed.2d 1039, 1064, 94 S.Ct. 3090]. In that case Chief Justice Burger put an executive privilege claim in proper perspective: "this presumptive privilege must be considered in light of our historic commitment to the rule of law. This is nowhere more profoundly manifest than in our view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.' *Berger* v. *United States*, 295 U.S., at 88. We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. . . . To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." Manifestly production of a fugitive felon is even more imperative to the function of criminal justice than production of evidence.

Similarly in *Nixon* v. *Sirica* (D.C.Cir. 1973) 487 F.2d 700, the court held the Chief Executive could not refuse to respond to a subpoena. Said the court, "He is not above the law's commands: 'With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law . . . .' Sovereignty remains at all times with the people, and they do not forfeit through elections the right to have the law construed against and applied to every citizen." (*Id.* at p. 711; also see *Youngstown Co.* v. *Sawyer* (1952) 343 U.S. 579 [96 L.Ed. 1153, 72 S.Ct. 863, 26 A.L.R.2d 1378].)

V

According to the majority, two years after the extradition request the Governor is still "exercising his prerogative to 'investigate.'" The only statutory authority to inquire into an extradition request is contained in Penal Code section 1548.3, which provides that the Governor may call upon the Attorney General or any district attorney to investigate the demand. At oral argument the Attorney General conceded that he had not been requested to undertake any investigation and that he was unaware of any investigation conducted for the Governor by any district attorney. No details of any past or present inquiry by the Governor have been offered to this court or to the courts below. We must conclude no

such statutory investigation has been undertaken on behalf of the Governor in the more than two years during which the matter has been pending.

What other justification is there for the position assumed by the Governor? I can find none. He concedes the extradition papers are in proper order; the fugitive was in the demanding state when the crimes were committed and was found guilty thereof; the fugitive is now in this state. If the Governor's duty to extradite is mandatory, he has not complied. If the Governor has the discretion to deny extradition, as the majority contend, he has not exercised that discretion. If the Governor desires law enforcement agencies to "investigate," he has yet to request them to do so. The Governor apparently insists he has some undefined inherent right to sit in perpetual contemplation of the matter, to neither grant nor deny the legal demand of a sister state for the return of a convicted felon who fled that state's justice and is harbored in California. This court stultifies itself by placing approval on such whimsical disregard of constitutional and statutory duty.

The interests of an effective and impartial criminal justice system, and the prevention of discord and retaliation among the states of the union, are best preserved by the enforcement of the Governor's mandatory duty to issue his warrant in response to a proper request for extradition. Should the fugitive believe the demand to be legally insufficient, he may review the proceedings by means of habeas corpus.

The foregoing principle is sound when the demanding state seeks return of a fugitive for purposes of trial. The validity of the concept is compounded when, as here, the fugitive has already been tried, found guilty of serious felonies, and has fled to avoid imposition of sentence.

I would issue the writ.

Clark, J., concurred.