[S.F. No. 24029. Dec. 27, 1979.]

In re the Petition of the COMMISSION
ON THE GOVERNORSHIP OF CALIFORNIA.

[S.F. No. 24021. Dec. 27, 1979.]

EDMUND G. BROWN, JR., as Governor, etc., et al., Petitioners, v.
MIKE CURB, as Lieutenant Governor, etc., et al., Respondents.

COUNSEL

Bion M. Gregory, Legislative Counsel, and Edward F. Nowak, Principal Deputy Legislative Counsel, for Petitioner in No. 24029.

J. Anthony Kline, William H. Levit, Jayson B. Lumish and Stroock & Stroock & Lavan for Petitioners in No. 24021.

Gibson, Dunn & Crutcher and Theodore B. Olson for Respondent Curb in No. 24021.

No appearance for other Respondents in No. 24021.

Ernest Duncan as Amicus Curiae on behalf of Respondents in No. 24021.

## OPINION

MANUEL, J.—In these consolidated cases we examine the gubernatorial powers of the Lieutenant Governor during the Governor's absence from the state and the powers of the Governor to rescind or revoke prior acts of the Lieutenant Governor. The dispute involves the Lieutenant Governor's appointment of a presiding justice of the Court of Appeal while the Governor was out of the state and the Governor's withdrawal of that appointment and substitution of his own appointee after his return to the state. ██ As hereafter developed, we conclude that the Lieutenant Governor has authority to exercise all gubernatorial powers of appointment while the Governor is physically absent from the state and that the Governor has authority to withdraw the appointment until the confirmation of appointment becomes effective.

Article V, section 10 of the Constitution provides in pertinent part: "...The Lieutenant Governor shall act as Governor during the impeachment, absence from the State, or other temporary disability of the Governor or of a Governor-elect who fails to take office." The section also declares that this court shall have "exclusive jurisdiction to determine all questions arising under this section," and confers exclusive standing to raise questions of temporary disability on "a body provided by statute."[1] Legislation creating the Commission on the Governorship (Commission) as the body having such standing (Gov. Code, §§ 12070-12076) took effect concurrently with adoption of article V, section 10 on November 8, 1966.

---

[1]Article V, section 10 provides in full: "The Lieutenant Governor shall become Governor when a vacancy occurs in the office of Governor. [¶] The Lieutenant Governor shall act as Governor during the impeachment, absence from the State, or other temporary disability of the Governor or of a Governor-elect who fails to take office. [¶] The Legislature shall provide an order of precedence after the Lieutenant Governor for succession to the office of Governor and for the temporary exercise of the Governor's functions. [¶] The Supreme Court has exclusive jurisdiction to determine all questions arising under this section. [¶] Standing to raise questions of vacancy or temporary disability is vested exclusively in a body provided by statute."

The salient facts are undisputed: Governor Edmund G. Brown, Jr., left California for Washington, D.C., at 10 a.m. on March 26, 1979, and returned on March 28, 1979, at 2:11 a.m., 40 hours later. On March 27, the executive assistant to Lieutenant Governor Mike Curb informed the Governor's secretary of the Lieutenant Governor's intention to appoint Judge Armand Arabian to the vacant presiding justiceship on the Court of Appeal. The executive assistant was advised that the Governor intended to appoint Justice Bernard S. Jefferson to the vacancy and that Justice Jefferson's name had already been submitted to the State Bar for evaluation. On the same date, the Lieutenant Governor appointed Judge Arabian as Presiding Justice for the Court of Appeal, Second Appellate District, Division One. On March 28, the Governor withdrew the appointment of Judge Arabian previously submitted by the Lieutenant Governor and appointed Justice Jefferson to the vacancy and at the same time appointed Judge Arleigh M. Woods as Associate Justice to fill the vacancy created by appointment of Justice Jefferson as Presiding Justice.

On May 7, 1979, Governor Brown and Justice Jefferson filed with this court a petition for writs of mandate and prohibition and for declaratory relief. Named respondents were Lieutenant Governor Curb, Judge Arabian, and the Commission on Judicial Appointments (the body with responsibility for confirming gubernatorial appointments of Court of Appeal justices).[2]

The Governor's petition prays that we direct the Commission on Judicial Appointments to act on the Jefferson appointment and that we declare that (1) no gubernatorial powers devolve on the Lieutenant Governor unless this court, on petition of the Commission, has first determined the existence of a temporary disability of the Governor, (2) the Arabian appointment is invalid because on March 27, the Governor "was not effectively 'absent from the state' within the meaning of article V, section 10, of the California Constitution," and (3) the Governor's withdrawal of the Arabian appointment prior to its confirmation was effective, leaving the Jefferson appointment the only one properly before the Commission on Judicial Appointments.

---

[2]Article VI, section 16, subdivision (d) of the Constitution provides that an appointment by the Governor to fill a vacancy in a Court of Appeal "is effective when confirmed by the Commission on Judicial Appointments." The Commission on Judicial Appointments consists of the Chief Justice, the Attorney General, and, when the appointment to be considered is to a Court of Appeal vacancy, the senior presiding justice of the affected Court of Appeal. (Art. VI, § 7.)

On May 21, 1979, the Commission filed a "Petition for Determination of Questions under section 10 of Article V of the California Constitution." The Commission states the constitutional (art. V, § 10) and statutory authority for its petition (Gov. Code, § 12070 et seq.),[3] recites the controversy over the conflicting appointments to a single vacancy on the Court of Appeal, urges the importance of "the question of the power of the Lieutenant Governor to act as Governor during the physical absence of the Governor from the state," and prays that this court "determine when the Governor is absent from the state within the meaning of Section 10 of article V of the California Constitution and, in so doing, set forth standards which may be applied to facts and circumstances which may foreseeably arise in the future."

We deal first with our jurisdiction and the standing of petitioners to invoke it. ■ Our exclusive jurisdiction to determine all questions arising under article V, section 10 is clear and unambiguous. The final sentence in the section states, however, that "[s]tanding to raise questions of vacancy or temporary disability is vested exclusively in a body provided by statute," namely, the Commission. As submitted to the Assembly by the Constitution Revision Commission, section 10 of article V provided for determining questions of vacancy and disability, but did not specify how or by whom the questions could be raised. The provision for exclusive standing in a statutory body was added to the draft on the floor of the Assembly (1 Assem. J. (1966 First Ex. Sess.) pp. 631, 705) at the request of the Office of the Governor, apparently for the purpose of forestalling frivolous or harassing attacks on the validity of gubernatorial actions.

It is obvious that absence from the state is a temporary disability within the meaning of article V, section 10,[4] and that any dispute as to the Governor's absence from the state is a matter with respect to which the Commission has exclusive standing before us. Once the question is

---

[3]The Commission, which consists of the President Pro Tem. of the Senate, the Speaker of the Assembly, the President of the University of California, the Chancellor of the California State Colleges, and the Director of Finance (Gov. Code, § 12070), "shall have exclusive authority to petition the Supreme Court to decide any questions relating to the existence of a temporary disability of the Governor" (Gov. Code, § 12072). Section 12073 provides for exclusive jurisdiction with regard to questions relating to termination of the temporary disability of the Governor.

[4]If that were not so, section 10 would not include the phrase "or *other* temporary disability of the Governor." (Italics added.) See also *post* page 118 for dialogue during legislative discussion of proposed amendment to article V, section 10.

properly raised, however, nothing in the section's wording or aims prevents us from concurrently considering pleadings and arguments from interested persons on matters within the scope of the Commission's question.

For purposes of establishing our present jurisdiction, therefore, we need not consider whether the questions raised by the Governor's petition concern "vacancy or temporary disability," as to which the constitutional provision accords him no standing; the filing of the Commission's petition effects its standing to invoke our jurisdiction and permits us concurrently to consider the issues presented by the Governor's petition.

 Because our jurisdiction is exclusive it transcends the procedural limitations on appellate courts imposed by article VI, sections 10 and 11. Granting of relief, declaratory or otherwise, that ordinarily would be available only from trial courts may be appropriate here. We are not persuaded by the Commission's petition, however, that article V, section 10 calls on us to give advisory opinions. The petition alleges that "the question of the power of the Lieutenant Governor to act as Governor during the physical absence of the Governor from the state encompasses the entire spectrum of executive power" and prays that in "determin[ing] when the Governor is absent from the state within the meaning of [art. V, § 10]" we "set forth standards which may be applied to facts and circumstances which may foreseeably arise in the future." It is well settled that rendering "advisory opinion" is not a judicial duty imposed by article III, section 3, or article VI, sections 10 or 11 of the Constitution. (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 119-120 [145 Cal.Rptr. 674, 577 P.2d 1014].) Our "exclusive jurisdiction to determine all questions arising under" article V, section 10 is subject to the same qualification. In this case the dispute concerning the Governor's disability due to absence involves a question that *has* arisen, and it is properly before us by petition of the Commission.

We turn to the principal issue presented by the controversy, namely, the interpretation of the words "absence from the State." Preliminarily, we consider and reject the Governor's contention that under article V, section 10, his departure from the state can confer no gubernatorial power on the Lieutenant Governor without a prior petition to this court by the Commission, followed by this court's determination that the absence would constitute a temporary disability. It is argued that our

"exclusive jurisdiction to determine all questions arising under" article V, section 10, makes us the only entity that can conclude authoritatively that the Governor is temporarily disabled by absence or other reason. The claimed prerequisite of a petition is based on the Commission's exclusive "[s]tanding to raise questions of vacancy or temporary disability."

We disagree. To require express judicial authorization before the Lieutenant Governor could act as Governor during the Governor's absence or other temporary disability would contravene the purpose of article V, section 10, to prevent gaps in the availability and continuity of the executive power. As explained in the discussion of our present jurisdiction, the Constitution charges us only with determining "questions" of temporary disability, not with giving advisory opinions in the absence of dispute. The Lieutenant Governor—like any public officer with executive duties—must apply and, if necessary, interpret the law prescribing those duties as found in the Constitution, legislation, and authoritative decisions. Our role is to resolve controversies as to interpretation, not to dictate initial formulations.

■■■ The parties offer two possible interpretations of the words "absence from the State." The Governor proposes that the term "absence" must be read as an "effective absence," an absence determined by the state's need at the time for the particular act by the official then physically present. The Lieutenant Governor, on the other hand, asserts that the term must be given its literal, common meaning of physical nonpresence. We conclude that constitutional and legislative history, contemporaneous interpretation and historical practice, and considerations of public policy, namely the need for certainty in effectuating executive decisions, support the Lieutenant Governor's position.

The words "absence from the state" have remained unchanged in the California Constitution for 130 years despite several other changes in the pertinent clause. From 1849 to 1966, the Constitution provided that in case of the Governor's "impeachment" or "absence from the State" his duties "devolve upon" the Lieutenant Governor "until the disability shall cease." (Cal. Const. of 1849, art. V, § 17; Cal. Const. of 1879, art. V, § 16, with amendments of 1898, 1946 and 1948.) Present article V, section 10, adopted in 1966 and amended in 1974, similarly provides that the Lieutenant Governor "shall act as Governor during the impeachment, absence from the State, or other temporary disability of the Governor."

In 1966, during legislative discussion of the proposed amendment to article V, section 10, special counsel to the Constitution Revision Commission was asked the meaning of "absence from the state" and its reference to "disability." Counsel's response indicated that "absence from the state" meant physical absence in the literal sense; as to the use of the term "disability," he stated: "...[T]he Commission felt that if the constitution should prohibit the Governor from acting then it should be classified as a disability. It is not an inability. The Governor could be someplace outside the state and be very capable of performing his duties by a long distance telephone. He would be legally disabled from doing so. Disability is more accurate."[5]

Our attention has been called to no previous challenge in court to the proposition that the Governor's physical absence from California confers full gubernatorial power on a physically present Lieutenant Governor. The state government has functioned under this provision without any question that its language means what it plainly states.[6]

It is argued that the word "absence" should be interpreted to reflect modern conditions of travel and communication and that technology has eliminated in part the objections that drafters of the early Constitutions might have had to permitting the Governor to act from outside the state or to permitting postponement of gubernatorial actions until his return. We note that the Constitution Revision Commission could have proposed a change in the language in 1966 to reflect modern conditions

---

[5]Transcript, Assembly Interim Committee on Constitutional Amendments, February 23, 1966, pages 29-34. Additional dialogue supports a literal interpretation of the word "absence":

Legislator: "And then, of course, absence from the state. What does absence from the state mean? Is that defined somewhere else? Suppose the Governor goes to Timbuktu or somewhere outside of the United States. During that time the Lieutenant Governor is by this provision acting temporarily. Is that right?

Counsel: "That's correct. That's the existing law. We put these two examples [impeachment and absence from the state] in...because we wanted to be sure that these were construed to be temporary disability, because if we just said temporary disability we think it would be reasonable for someone to construe impeachment as not being temporary disability." (*Id.*, p. 33.)

We have no doubt that counsel's reference to "existing law" was a reference to the Constitution as it read prior to the amendments then being discussed.

[6]Historical research reveals that in the past 16 years more than 1,400 gubernatorial actions (proclamations, executive orders, pardons and signing of legislation) have been taken by an acting governor while the Governor was physically absent from the state.

of travel and communication but did not do so. We are not persuaded that time or technology compels such a change by judicial fiat.

We are mindful that some jurisdictions have interpreted similar provisions to prevent the acting governor or other executive from exercising full executive powers, or more precisely, to invalidate the acts of officials empowered to perform executive functions during the absence of the executive from the city or state.[7] The Governor embraces the theory propounded by these cases and contends that not merely physical absence but "effective" absence must be shown before the substitute executive can act. The rationale of the cases that support his view is summarized in *Sawyer* (82 Nev. 53, 56 [410 P.2d 748]): "'absence' as contained within rules for orderly succession in government means 'effective absence'—i.e., an absence which is measured by the state's *need* at a given moment for a particular act by the official then physically not present."

The conceptual difficulty with the effective-absence test is that virtually any physical absence of the Governor may create a need for action by an acting governor, at least to deal with emergencies. The Governor here does not claim any power to act from outside the state boundaries, nor does it appear that any such claim has ever been made by his predecessors. Since a physically absent Governor cannot act, the overriding purpose of avoiding a hiatus in the availability of executive power requires that, during the absence, the sole and entire power to act as Governor be transferred to a Lieutenant Governor who is physically within the state.

Legislative enactments which implement article V, section 10, are in full accord with this view. Section 12002 of the Government Code provides that "Every law of this State relating to the powers and duties of the Governor and to acts and duties to be performed by others toward him extends to the person performing for the time being the duties of Governor." Section 12058 (Gov. Code), enacted in 1966, provides that "[i]n case of impeachment of the Governor or officer acting as Governor, his *absence from the state, or his other temporary disability to discharge the powers and duties of office,* then the powers and duties of

---

[7]*Sawyer v. First Judicial District Court* (1966) 82 Nev. 53 [410 P.2d 748]; *Gelinas v. Fugere* (1935) 55 R.I. 225 [180 A. 346]; *Cytacki v. Buscko* (1924) 226 Mich. 524 [197 N.W. 1021]; *State* ex rel. *Olson v. Lahiff* (1911) 146 Wis. 490 [131 N.W. 824]; *Watkins v. Mooney* (1903) 114 Ky. 646 [71 S.W. 622]; *Mayor of Detroit v. Moran* (1881) 46 Mich. 213 [9 N.W. 252]. We find these cases neither persuasive nor controlling.

the office of Governor devolve upon the same officer as in the case of vacancy in the office of Governor, but only until the disability shall cease." (Italics added.)

There is no room in the all inclusive language of these statutes for a watered down "effective" absence or any other concept whereby an acting governor could discharge some but not all of the duties of the governor in his absence.

Our conclusion is also in accord with the contemporaneous and settled interpretation of the constitutional provision by those charged with its execution. (See *State of South Dakota* v. *Brown* (1978) 20 Cal.3d 765, 777-778 [144 Cal.Rptr. 758, 576 P.2d 473] and cases there cited.) We take judicial notice (Evid. Code, § 452, subd. (c)) of the more than 1,400 gubernatorial actions taken in the last 16 years by Lieutenant Governors or other acting governors during the Governor's absence. The unquestioned acceptance of these exercises of gubernatorial power is evidence of a settled contemporaneous construction deserving of great weight. (*City of Los Angeles* v. *Rancho Homes, Inc.* (1953) 40 Cal.2d 764, 770-771 [256 P.2d 305]; *State of South Dakota* v. *Brown, supra,* 20 Cal.3d at pp. 777-778.)[8] "Not lightly vacated is the verdict of quiescent years." (*Anderson Nat. Bank* v. *Luckett* (1944) 321 U.S. 233, 244 [88 L.Ed. 692, 703, 64 S.Ct. 599, 606, 151 A.L.R. 824], quoting from *Coler* v. *Corn Exchange Bank* (1928) 250 N.Y. 136, 141 [164 N.E. 882, 884, 65 A.L.R. 879].)

The command that the Lieutenant Governor "act as Governor" during the Governor's absence (art. V, § 10) places upon the Lieutenant Governor complete, albeit temporary, responsibility for "[t]he supreme executive power of the State" and for "see[ing] that the law is faithfully executed" (art. V, § 1). As acting governor, the Lieutenant Governor is free to act on whatever matters he determines need attention during the Governor's absence. Thus, the appointment by Lieutenant Governor Curb of Judge Arabian as presiding justice of the Court of Appeal was valid.

■ There remains the question of the Governor's authority to revoke, rescind, or withdraw the appointment of Judge Arabian.

---

[8]Also of interest is the experience of former Governor Earl Warren. In the Memoirs of Earl Warren (1977) at pages 264-265, he tells of leaving unsigned bills in a safe deposit box so that a contemporary Lieutenant Governor could not sign them into law while Warren was on a trip to England.

The Lieutenant Governor contends that his letter submitting the Arabian appointment to the Commission on Judicial Appointments exhausted the appointive power and could not be revoked by gubernatorial act. The leading statement of the principle relied on is in *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137 [2 L.Ed. 60], where President Jefferson's Secretary of State, Madison, was held to have a ministerial duty to deliver a document evidencing Marbury's appointment as justice of the peace made by outgoing President Adams with the advice and consent of the Senate. Chief Justice Marshall's opinion states: "The last act to be done by the president is the signature of the commission: he has then acted on the advice and consent of the senate to his own nomination. The time for deliberation has then passed: he has decided. His judgment, on the advice and consent of the senate, concurring with his nomination, has been made, and the officer is appointed. This appointment is evidenced by an open unequivocal act; and being the last act required from the person making it, necessarily excludes the idea of its being, so far as respects the appointment, an inchoate and incomplete transaction.

"Some point of time must be taken, when the power of the executive over an officer, not removable at his will, must cease. That point of time must be, when the constitutional power of appointment has been exercised. And this power has been exercised, when the last act, required from the person possessing the power, has been performed: this last act is the signature of the commission." (5 U.S. at p. 157 [2 L.Ed. at p. 67].)

California courts have followed that principle. (See *Weatherbee* v. *Cazneau* (1862) 20 Cal. 503 [Governor's interim appointment]; *People* ex rel. *Ryder* v. *Mizner* (1857) 7 Cal. 519, 526 [same]; *MacAlister* v. *Baker* (1934) 139 Cal.App. 183 [33 P.2d 469] [city council's appointment to vacant council seat].) On the other hand, uncompleted appointments are subject to withdrawal. (See *Conger* v. *Gilmer* (1867) 32 Cal. 75 [board of supervisors could reconsider appointment before issuing appointee a commission]; *Harrington* v. *Pardee* (1905) 1 Cal. App. 278 [82 P. 83].) Thus, in *Harrington*, Governor Pardee was held entitled to refuse to issue a commission to a person whose appointment by his predecessor had been confirmed by the Senate, since issuance of the commission was deemed a discretionary act.

*Harrington* is distinguishable here because transmittal of an appointment to the Commission on Judicial Appointments completes the

gubernatorial action necessary to an appellate judicial appointment. Though the Governor issues commissions to new appellate judges (see Gov. Code, § 1340, subd. (d)), the Constitution makes the appointment "effective when confirmed by the Commission on Judicial Appointments." (Art. VI, § 16, subd. (d); see Gov. Code, § 68121 [confirmation "is effective when filed in writing with the Secretary of State"].)

Even though submission for commission confirmation completes the gubernatorial action necessary for an appointment to an appellate judgeship, it does not complete the appointive process or confer even an interim right to assume office.[9] Under those circumstances may the Governor withdraw the appointment before confirmation?

Past governors appear to have withdrawn appointments from commission consideration without challenge of their power to do so. (See Partial Rep. of Joint Judiciary Com. on Administration of Justice, pp. 38-39, 2 Appen. to Sen. J. (1959 Reg. Sess.), testimony of Chief Justice Gibson.) There are good reasons for upholding the power. The fact that the appointee has not yet acquired any rights eliminates the objection that withdrawal constitutes removal from office. The withdrawal power prolongs gubernatorial scrutiny of the appointment, furthering the confirmation's ultimate purpose of assuring thorough consideration of the candidate's qualifications. (See Nelson, *Variations on a Theme—Selection and Tenure of Judges* (1962) 36 So.Cal.L.Rev. 4, 19-26.)

Finally, the general rule in other states is that "where the nomination must be confirmed before the officer can take the office or exercise any of its functions, the power of removal is not involved and nominations may be changed at the will of the executive until title to the office is vested." (*McChesney* v. *Sampson* (1930) 232 Ky. 395, 401 [23 S.W. 2d 584]; accord: *McBride* v. *Osborn* (1942) 59 Ariz. 321 [127 P.2d 134] [upholding withdrawal]; *Burke* v. *Schmidt* (1971) 86 S.D. 71 [191 N.W.2d 281]; *In re Advisory Opinion to the Governor* (Fla. 1971) 247 So.2d 428, 433; *State* ex rel. *Todd* v. *Essling* (1964) 268 Minn. 151, 156 [128 N.W. 2d 307].) Therefore we conclude that Governor Brown's withdrawal of the Arabian appointment was valid.

Let a peremptory writ of mandate issue directing the Commission on Judicial Appointments to exercise its discretion with respect to the appointment of Justice Jefferson.

---

[9]We are not here called upon to decide at what point the appointment of a judge not subject to confirmation by the Commission on Judicial Appointments becomes irrevocable.

Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., and Taylor, J.,* concurred.

NEWMAN, J., Concurring.—I agree that the withdrawal of the Arabian appointment was valid and that the writ should issue. I do not agree that "a physically absent Governor cannot act" (*ante*, p. 119).

That phrases in a constitution were deemed apt for a horse-and-wagon era does not ordain that we eschew sensible, up-to-date analysis of their meaning 130 years later. Justice Holmes once cautioned: "[W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. . . . The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago. . . . We must consider what this country has become. . . ." (*Missouri* v. *Holland* (1920) 252 U.S. 416, 433-434 [64 L.Ed. 641, 647-648, 40 S.Ct. 382, 11 A.L.R. 984].)

His wise admonition applies here, as does this comment by Chief Justice Hughes in *Home Bldg. & Loan Ass'n.* v. *Blaisdell* (1934) 290 U.S. 398, 442 [78 L.Ed. 413, 431-432, 54 S.Ct. 231, 88 A.L.R. 1481] (see also Miller, *The Elusive Search for Values in Constitutional Interpretation* (1979) 6 Hastings Const.L.Q. 487): "It is no answer to. . . insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means to-day, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning—'We must never forget that it is a *constitution* we are expounding' (*McCulloch* v. *Maryland*, 4 Wheat. 316, 407)—'a constitution intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs.' *Id.*, p. 415. . . . [¶] *[W]e*

---

*Assigned by the Acting Chairperson of the Judicial Council.

*find no warrant for the conclusion that . . . the founders of our Government would have interpreted the clause [at issue] differently had they had occasion to assume that responsibility in the conditions of the later day.*" (Italics in that final sentence added.)

In our case the focus of the majority opinion is "absence." How to interpret the phrase "absence from the State" is labeled "the principal issue presented by the controversy" (*ante*, p. 116).

I believe that we are better guided if we focus not on "absence" but instead on the words "other temporary disability." The California Constitution in article IV, § 21 (b) provides for "[f]illing of the office of Governor should the Governor be killed, missing, or *disabled*, until the Governor . . . is *able* to perform the duties of the office" (italics added). Article V, § 10 refers to other "temporary exercise of the Governor's functions"; and it orders the Lieutenant Governor to "act as Governor during the impeachment, absence from the State, or OTHER TEMPORARY DISABILITY of the Governor" (emphasis added).

My majority colleagues conclude that "absence" means having crossed a state boundary. Might it rather mean now what the draftsmen intended it to mean 130 years ago; that is, absence constitutes a disability like other temporary disabilities when now, as then, *in fact* it is disabling? (Note again the words "disabled" and "able" in art. IV, § 21 (b), quoted in my preceding paragraph.)

When the Governor is absent from the state is he in fact disabled from performing the duties of his office? Indeed he is not. Car-to-office, air-to-ground, and ship-to-shore calls are routine; so are conference calls and closed-circuit TV consultation. Many tasks that Governors have performed while temporarily residing in San Francisco or Los Angeles, say, could be done from any city, within or without California. Constant travelers such as the President of the United States, the Governors of other states with problems comparable to ours, the mayors of great cities, and countless government and corporate executives every day benefit from telecopiers, distance-ignoring word-processors, "talking" typewriters, signature reproducers, instant information-retrieval, other marvels not affected by state or even international boundaries. (Cf. Hanna, *Law Office of the Future* (Feb. 1979) N.J. State Bar J. No. 86, p. 10; Brown, *N.Y.U. Law Professor to Teach on Coast via TV*, N.Y. Times (Sept. 5, 1979) ("an interactive hookup by satellite that will permit him to take questions and engage . . . in discussion for an hour").

So therefore should we infer that, in the 20th century, absence is never disabling? The answer is No. The Lieutenant Governor (or his surrogate, should he too be temporarily disabled) must be alert not only "[t]o meet the needs resulting from war-caused or enemy-caused disaster" (art. IV, § 21) but also to act as Governor whenever the elected Governor suffers a true disability. It could be caused by serious illness. It could occur when he is incommunicado—in a jungle or a mountain wilderness, for instance, or because of a natural disaster or other catastrophe. It could be the result of electronic or other malfunctioning. But the test should always be "disability." *Absence that is not disabling is not a temporary disability.*

The 1849 and 1879 constitutions talked of the Governor's "inability to discharge the powers and duties of the said office" and required the Lieutenant Governor to act "until the disability shall cease." To hold in this Centennial Year 1979 that the 130-year-old tradition must be frozen until modernized by constitutional amendment seems almost irrational and yet radical. By no means does rationality call for a Gold Rush Days approach to governing. (See the quotations from Justices Holmes and Hughes, *supra*.) And when we contemplate its antiquated, stifling, and potentially hurtful impact on use of the executive power in our complex state, cannot the majority's approach here fairly be labeled radical (albeit reactionary)?

The majority concede that "the purpose of article V, section 10, [is] to prevent gaps in the availability and continuity of the executive power" (*ante*, p. 117); and they refer to "public policy, namely the need for certainty in effectuating executive decisions" (*ante*, p. 117). Yet neither the availability nor the continuity of executive power need be affected by mere absence. (See *In re Advisory Opinion to the Governor* (Fla. 1959) 112 So.2d 843.) Moreover, serious discontinuity and uncertainty and even bizarre effects can result from the pretense that "a physically absent Governor cannot act." (*Ante*, p. 119. The Justice Jefferson vs. Judge Arabian contretemps here is illustrative; and cf. *Program of Would-Be Acting Governor Curbed*, S.F. Examiner (Nov. 8, 1979) p. 46.[1])

---

[1]If, hypothetically, Earl Warren had been Chief Justice of California and not a politically ambitious Governor, would he have construed "absence from the State" restrictively? Cf. the majority's footnote 8 and also Rodda, *The not-always-accurate memoirs of Earl Warren*, (Nov. 1977) Cal. J. page 378.

## What Was the True Intent in 1966?

The scores of individuals involved in the drafting and approval of the 1966 revision of the words concerning us that now are in effect ("The Lieutenant Governor shall act as Governor during the impeachment, absence from the State, or other temporary disability of the Governor") might have written, "The Lieutenant Governor shall act as Governor during the impeachment or other temporary disability of the Governor." Instead they included and thus preserved "absence from the State." Does that imply an intent in 1966 to cast in concrete all the old assumptions on what those four words demand? I think not.

In February 1966 the California Constitution Revision Commission submitted the first of many reports to the Legislature. It was lengthy (212 pages). It proposed *first*, that many words (16,000 out of 22,000) be deleted from the Constitution (from articles III to VIII and also XXIV); *second*, that many other words be left unchanged; *third*, that new wordings be adopted to effect major and minor revisions, several of them simplificatory only.

Was there an intent in 1966 to freeze the nonjudicial, archaic interpretation of "absence from the State" that my majority colleagues now decree? Their opinion relies on excerpts from February 23, 1966, testimony before the Assembly Interim Committee on Constitutional Amendments. They summarize it as follows (*ante*, p. 118): "[S]pecial counsel to the Constitution Revision Commission was asked the meaning of 'absence from the state' and its reference to 'disability.' Counsel's response indicated that 'absence from the state' meant physical absence in the literal sense; as to the use of the term 'disability,' he stated: '. . . [T]he Commission felt that if the Constitution should prohibit the Governor from acting then it should be classified as a disability. It is not an inability. The Governor could be some place outside the State and be very capable of performing his duties by a long distance telephone. He would be legally disabled from doing so. Disability is more accurate.'"

The quoted words (and also those in the majority's fn. 5) are best understood if we check the full testimony. "To use snippets . . . is perilous." (*People* v. *Tanner* (1979) 24 Cal.3d 514, at p. 539 [156 Cal.Rptr. 450, 596 P.2d 328] (conc. opn.).)

The Commission's special counsel and the staff attorney who testified with him understandably had to ad-lib many answers to often-tough questions put by legislators at the hearing.[2] I doubt that the special counsel, if pressed, could have documented his view (quoted in my excerpt from the majority opinion) as to what it was "the Commission felt." There were some 80 commissioners—including 6 legislative members, 17 "ex officio legislative members," and 11 individuals who had resigned or died. The draft language that puzzles us here was a tiny segment of a huge set of initial recommendations. Most commissioners, obviously, "felt" nothing whatsoever on our subject.

Regarding what "the Commission [might have] felt," are not the most reliable guides the words that appear in the Commission's formal proposal? It read: "The Lieutenant Governor...shall act as Governor during the impeachment, absence from the State, or other temporary disability of the Governor....The Legislature shall provide for an order of precedence after the Lieutenant Governor...for the temporary exercise of [the Governor's] functions."

To be contrasted are certain words (which I now bracket and italicize) that the Commission proposed to delete from the then existing Constitution, as amended in 1948: "In case of impeachment of the Governor..., his absence from the State, or his other temporary disability [*to discharge the powers and duties of office*], then the powers and duties of the Office of Governor devolve upon the same officer as in the case of vacancy in the Office of Governor [*but only until the disability shall cease*]."

It seems clear that the proposed deletion of "to discharge the powers and duties of office" evidenced no intent to change "other temporary

---

[2]That sometimes the correct answers were not known is shown by this exchange: "WILLSON:...What is the process in the Constitution for impeaching the Governor of the State of California? Is there a trial by the Assembly and trial by the Senate? [¶] [SPECIAL COUNSEL]: He is tried by the Assembly, I believe, he is tried by the lower house. [¶] WILLSON: Is there a written charge that claims he should be impeached on certain charges? Is that the way it operates? [¶] [SPECIAL COUNSEL]: The specific form, the pleading, is not in the Constitution, Mr. Willson, and I'm not sure what it is."

One wonders why the staff attorney said that "the Supreme Court could provide for an acting Governor" in this excerpt: "[I]f the Governor were merely impeached the Supreme Court could provide for an acting Governor in the Lieutenant Governor who would take over the duties of office until the Governor was either convicted, in which case the Lieutenant Governor would become Governor, or was acquitted, in which case the Governor would resume his office."

The two excerpts exemplify the kind of partially correct answering that often typifies legislative committee hearings.

disability" and that the deletion of "but only until the disability shall cease" involved mere style. Those two phrases are helpful, though, in analyzing the 1946 deletion of the word "inability."

## INABILITY AND DISABILITY

Readers will recall, from an earlier paragraph in this opinion, the dictum of the Revision Commission's special counsel that "[D]isability...is not an inability." The 1849 constitution provided that "the powers and duties of the office shall devolve upon the Lieutenant Governor...until the disability shall cease"; and "disability" meant impeachment, absence from the State, and "*inability* to discharge the powers and duties of the office" (italics added). There was no change in 1879.

In 1946 the clause was amended to read, "In case of the impeachment of the Governor..., his absence from [the] State, or his other temporary disability to discharge the powers and duties of office, then the powers and duties of the office of Governor devolve..., but only until the disability shall cease." *In this lawsuit there is not even a scrap of evidence that suggests any intent by anyone in 1946 to distinguish "disability" from "inability."* For nearly a century the words had been treated as synonymous. After 1946 they still were synonymous. The special counsel erred, I think, when he ad-libbed his brief comment in 1966.

Further, a Revision Commission memo on "Presentation of proposed Article V," addressed by the staff attorney on April 7, 1966, to the Chairman of the Commission, the Chairman of its Article V Committee, and the Chairman of its Drafting Committee, on page 3 states: "Standard of 'temporary disability' has a sufficiently definite and understood meaning to serve as a reasonable guideline for the court. Additional detail might bind the court, in a situation which we cannot now foresee, in a way that defeats the otherwise clear purpose underlying the scheme of succession and disability provisions." What was that clear purpose? It was to have the "scheme of succession" take effect whenever the Governor becomes temporarily disabled, for any reason.

Quite comparable is this excerpt from the hearings: "SONG: ...[W]hat if a Governor is so physically disabled he's confined to bed? His mental process is working quite well. I would assume, then, from

what you say, that the court can declare the office vacant. [¶] [STAFF ATTORNEY]: They would have that authority, yes, subject to all the responsibilities placed upon a judiciary construing the Constitution. [¶] SONG: Shouldn't certain limitations be spelled out in the Constitution? [¶] [STAFF ATTORNEY]: We felt that the spelling out of certain limitations and describing specific situations left the body which has to make this ultimate determination, a very difficult determination, really insufficient tools to do it with."

Nonetheless the majority opinion here does spell out an indisputably needless limitation; i.e., that mere absence is a disability, always.

In sum, analysis and history justify a conclusion that "absence from the State" does mean now what it meant when it was first written. In 1979, as in 1849, absence should effect the transfer of gubernatorial power only when in fact it is disabling, temporarily.

### OFFICIAL TRAVEL?

A hidden weakness in the majority opinion is disclosed when we examine its reach. Californians are advised that *"the sole and entire power* to act as Governor" is transferred to the Lieutenant Governor when he is within the state while the Governor is outside (*ante*, p. 119; italics added). Similarly he has *"complete*, albeit temporary, responsibility"; and he is "free to act on *whatever matters* he determines need attention during the Governor's absence" (*ante*, p. 120; italics added).

What those words overlook is that most travels by modern Governors are for official state purposes. Most trips involve something more than seeking federal office, exploring a distant continent, or vacationing with family or friends. Yet if the Lieutenant Governor truly does have "the sole and entire power," if his duties do involve "complete. . .responsibility," if he is "free to act on whatever matters he determines need attention," then may he not legally intervene in the official projects of the traveling Governor?

To illustrate: How should a Congressional committee respond if a telegram or phone call from a Sacramento-based Lieutenant Governor purports to negate the on-going testimony of a Governor who is in Washington, D.C., to describe California's emergency needs? When the

Governor is absent here but present there, who articulates authoritatively our state's concerns at the out-of-state headquarters of the innumerable officials who, pursuant to negotiations that might involve the Governor, supply federal funds for state use? Who speaks and acts for California at Governors' sessions, at formal meetings with other-state and overseas investors, at innumerable other "outside forums" where the Governor's main concerns demonstrably are official concerns?

The majority opinion fails to recognize those questions. It ignores even more intricate questions as to the need for limitations on a Lieutenant Governor's power to undermine indirectly, in Sacramento, gubernatorial projects outside the state that for various reasons an ambitious Lieutenant Governor might not wish to countermand or modify directly.

Finally, the majority's words are so comprehensive that they may even authorize improbable, yo-yo-like contests regarding rescission or revocation of prior acts of the Governor. In this case, for example, what might have happened if the Lieutenant Governor, after March 28, 1979, and during a subsequent absence of the Governor, had withdrawn the Jefferson appointment and reappointed Arabian?

I conclude by quoting the possibly prophetic comment of a legislator during the 1966 committee hearings: "Assuming we have a Democratic Governor and a Republican Lieutenant Governor, I can see the court getting into the midst of a tremendous political brawl...."