[L.A. No. 31516. May 10, 1982.]

RICHARD M. CARMAN, Plaintiff and Appellant, v.
H. B. ALVORD, as Tax Collector, etc., et al., Defendants and
Respondents.

**Counsel**

David Daar, Michael R. Newman, Miller & Daar and Erwin Sobel for Plaintiff and Appellant.

John Howard Sullivan, Ronald A. Zumbrun, John H. Findley and Joseph E. Maloney as Amici Curiae on behalf of Plaintiff and Appellant.

Graham A. Ritchie, City Attorney, and Simmons, Ritchie, Segal & Stark for Defendants and Respondents.

Jeffrey N. Haney, Acting City Attorney (Oakland), Susan Watkins, Assistant City Attorney, Michael W. Stamp, Alan C. Davis, Duane W. Reno, Davis, Cowell & Bowe, George Agnost, City Attorney (San Francisco), Burk E. Delventhal, Deputy City Attorney, Norman Lieberman, City Attorney (Monterey Park), Meserve, Mumper & Hughes, William D. Ross, Ochoa, Barbosa & Glennon, Henry S. Barbosa, Bert Glennon, Jr., Richard J. Morillo, Sidney Maleck, City Attorney (El Monte), A. Charles Dell'Ario, Elizabeth J. Robison, Wendel, Lawlor, Rosen & Black, Robert C. Hays, Arnold S. Petersen and John L. Cook, City Attorney (Eureka), as Amici Curiae on behalf of Defendants and Respondents.

George Deukmejian, Attorney General, and Gordon Zane, Deputy Attorney General, as Amici Curiae.

**OPINION**

**NEWMAN, J.**—Richard Carman, a landowner in San Gabriel (City), appeals from a judgment of dismissal after the demurrer to his third amended complaint for refund of 1978-1979 taxes was sustained without leave to amend. The issue is whether article XIII A of the state Constitution (the four-year-old Prop. 13) permits levy of an ad valorem tax in excess of the 1-percent-of-value limit, in order to meet City's obligations to the Public Employees' Retirement System (PERS).

We conclude that the tax is permitted by section 1 of article XIII A, which provides: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. . . . [¶] (b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective."

In 1948 local electors approved a ballot measure authorizing City to join the State Employees' Retirement System (now PERS). (See Gov. Code, §§ 20000 et seq., 20450.[1]) The City was empowered to "levy and collect annually, as contemplated in [the statewide statute], a special tax sufficient to raise the amount estimated by [the City] Council to be required to meet the obligations of said City to said retirement system."[2] City exercised the authority, contracted with PERS, and began collecting annual taxes to fund its contributions.

In June 1978 Californians added article XIII A to the Constitution. Its ceiling on ad valorem property taxes (§ 1, subd. (a), *supra*) became effective on July 1, 1978 (see § 5).

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

[2] The ballot proposition at the election of April 13, 1948, was as follows: "Shall the City of San Gabriel fully participate in the State Employees' Retirement System of the State of California, making the employees of said City members of said system in and under the provisions of the 'State Employees' Retirement Act' of said State, as amended, and levy and collect annually, as contemplated in said act, a special tax sufficient to raise the amount estimated by said Council to be required to provide sufficient revenues to meet the obligations of said City to said retirement system?"

In September 1978 the council determined that the amount due PERS for that fiscal year was $450,619 and that the total assessed value of taxable real property was $93,879,005. It therefore levied a special 1978-1979 tax of 48 cents per $100 of assessed value to defray its PERS obligation.

In June 1979 plaintiff brought a class action for himself and all other City property taxpayers. He alleged that the PERS tax violated article XIII A because it exceeded the 1 percent limit. He requested a refund, an injunction against further levy and collection, and declaratory relief. City demurred, arguing that class actions for tax refunds are improper. The court sustained the demurrer and struck plaintiff's claim for class relief. He appealed (his first appeal).

While the appeal was pending, he filed amended complaints, the third of which included a count for class relief expressly designed to preserve that issue if it were won on appeal. City then demurred generally. Its memorandum of points and authorities argued that the class allegations had been disposed of, except for appeal, and that counts for injunctive and declaratory relief are improper in tax cases. In February 1980 the court sustained the demurrer without leave to amend, "as to all 3 causes of action pursuant to C.C.P. 430.10e [facts insufficient to state cause of action] and on all grounds raised in defendants Points and Authorities." The action was dismissed and plaintiff again appealed (the current appeal).

In June 1980, the Court of Appeal decided the first appeal, concluding that class tax-refund suits are permissible. Plaintiff's opening brief in the current appeal urged that ruling as "law of the case" and disclaimed intent to pursue the injunction and declaratory relief counts. Hence, he asserted, the grounds for demurrer accepted by the trial court no longer existed; and the judgment of dismissal should be reversed.

City's responsive brief raised the Proposition 13 issue for the first time. In effect City conceded that earlier arguments for dismissal no longer applied. It argued nonetheless that the third amended complaint stated no claim because the challenged tax was authorized by section 1 of article XIII A. In reply plaintiff agreed that the legality of the tax was at issue, and he joined City in requesting a ruling on the requirements of Proposition 13.

■ Is the Legality of the Tax at Issue?

■ A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground. (See *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 504 and fn. 2 [146 Cal.Rptr. 614, 579 P.2d 505]; *Weinstock* v. *Eissler* (1964) 224 Cal.App.2d 212, 225 [36 Cal.Rptr. 537].) A general demurrer searches the complaint for all defects going to the existence of a cause of action and places at issue the legal merits of the action on assumed facts. (See *Banerian* v. *O'Malley* (1974) 42 Cal.App.3d 604, 610-611 [116 Cal.Rptr. 919]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleadings, § 802, p. 2415.) ■ The court here sustained the demurrer on the ground, among others, that the third amended complaint "does not state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 430.10, subd. (e); see also § 472d.)

Further, the rule that on appeal a litigant may not argue theories for the first time does not apply to pure questions of law. (*Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) All parties and numerous amici urge that we resolve the Proposition 13 issue.[3] We conclude that the merits of that question are properly before us.

What Was Meant by "Interest and Redemption Charges on ... Any Indebtedness Approved by the Voters"?

Subdivision (b) of article XIII A, section 1, provides, "The [1 percent] limitation ... shall not apply to ad valorem taxes or special assessments to pay the *interest and redemption charges on any indebtedness approved by the voters* prior to the time this section becomes effective." (Italics added.) ■ City and amici contend that its PERS levy is within the exemption.

Plaintiff argues that the 1978-1979 payment owed PERS was not a prior "indebtedness approved by the voters" because the charge arises

---

[3]Amicus briefs in City's support have been filed by the City and County of San Francisco, the City of Oakland, the Cities of Monrovia, Montebello, Monterey Park, and El Monte, the Federated Firefighters of California, and the California State Firemen's Association. We refer to them as amici. Briefs in plaintiff's behalf have been filed by the Pacific Legal Foundation, the California Taxpayers' Association, and Edouard B. McKnight (an Oakland taxpayer). We refer to that group as taxpayers. PERS has filed a brief that cites inaccuracies in the Court of Appeal opinion but articulates no position on the merits.

each year, is "annually executory," and may be terminated by City at will. (See § 20560 et seq.) He notes that, if on termination the employer fails to pay unfunded amounts due PERS, employees' benefits simply are reduced accordingly (§ 20564).

The contention has two prongs: first, that within the meaning of subdivision (b) no true indebtedness ever arises under a PERS contract; second, that no annual contribution assessed after the article XIII A limit became effective can meet the requirement of prior voter approval. Both prongs involve the premise that article XIII A seeks to exempt only traditional, fixed, long-term debt for borrowed funds.

What plaintiff's theory ignores is the employer's duty to employees to pay pensions promised and earned. By entering public service an employee obtains a vested contractual right to earn a pension on terms substantially equivalent to those then offered by the employer. (See, e.g., *Olson* v. *Cory* (1980) 27 Cal.3d 532, 540-541 [178 Cal.Rptr. 568, 636 P.2d 532]; *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863-864 [148 Cal.Rptr. 158, 582 P.2d 614]; *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 852-853 [179 P.2d 799].) On the employee's retirement after he has fulfilled pension conditions an immediate obligation arises to pay benefits earned. Earned benefits are deferred compensation (*Olson, supra*, 27 Cal.3d at p. 540) and, when payable, become a fixed indebtedness of the employer.[4]

Theoretically, the employer can provide for the indebtedness in varying ways. It can pay obligations from current revenue as they accrue, or it can insure them through PERS (§ 20000 et seq.) or by other means (§ 45300 et seq.). Contributions to PERS are in the nature of insurance premiums (§ 20456); during the contract term they represent the employer's ongoing share of the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees, statewide. (See, e.g., §§ 20564, 20750 et seq.) From premiums paid by all, PERS discharges each employer's indebtedness as it arises. (§ 21200 et seq.)

City's voters empowered it to offer the pension plan provided by PERS. They authorized the special tax set by statute insofar as neces-

---

[4]Pensions are a government obligation of great importance. They help induce faithful public service and provide agreed subsistence to retired public servants who have fulfilled their employment contracts. (*Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 351 [71 Cal.Rptr. 135, 444 P.2d 711].)

sary to fund the obligations. (Former § 20532.)[5] Necessarily they approved all indebtedness to employees, current and future, that would be incurred. (Cf. fn. 11, *post.*) Contributions to PERS are an efficient means of discharging City's pension debts; the debts, as approved by the voters, continue to accrue regardless of participation in the state system.[6]

■ "The term 'indebtedness' has no rigid or fixed meaning, but rather must be construed in every case in accord with its context." (*County of Shasta* v. *County of Trinity* (1980) 106 Cal.App.3d 30, 38 [165 Cal.Rptr. 18]; see 42 C.J.S., Indebtedness, p. 555.) It can include all financial obligations arising from contract (see, e.g., § 23231, defining indebtedness in county boundary-change proceedings), and it

---

[5]Section 20532 provided: "The governing body of a contracting agency having taxing power, or of a school district included under Chapter 4.5 of this part, shall, if necessary, levy and collect annually a special tax upon the assessable property within the agency or district in the number of cents per one hundred dollars ($100) of assessable property as will be sufficient to raise the amount estimated by the governing body to be required to provide sufficient revenue to meet the obligations of the agency or district for contributions to this system under and after termination of the contract. This rate of taxation may be in addition to the annual rate of taxation allowed by law to be levied in that agency or district. Any member of, or recipient of a benefit from, this system by reason of such a contract may maintain any appropriate action or proceeding to require performance of the duty herein and by Section 20564 imposed on a governing body."

That statute and a companion provision, section 45311 (authorizing a special tax for non-PERS pension plans), were repealed in 1977. (Stats. 1977, ch. 309, § 9, p. 1235, § 22, p. 1236.) Plaintiff suggests that, since cities require express statutory authority to levy property taxes, San Gabriel's power to levy the pension tax ended in 1977, regardless of article XIII A.

However, Revenue and Taxation Code sections 2260 and 2270 were in effect from 1973 through the effective date of article XIII A. They provide that local agencies may levy special property taxes exceeding the statutorily set 1 percent limit to pay the "cost of retirement and pension benefits or plans which are being provided pursuant to provisions of a city or county charter or which have been specifically approved by the voters of a local agency." (Subd. (5); see also fn. 9, *post.*) Beginning with the 1978-1979 fiscal year, section 93 (former § 2235 [see Stats. 1978, ch. 292, § 31, p. 609], renumbered § 2237 by Stats. 1978, ch. 332, § 27, p. 701) gives local agencies power to levy property taxes beyond the 1 percent limit in "the amount needed to make annual payments for the interest and principal on general obligation bonds *or other indebtedness approved by the voters prior to July 1, 1978 . . . .*" (Italics added.)

[6]Plaintiff and taxpayers imply that subdivision (b) exempts only indebtedness which was fixed and certain when approved. But the subdivision imposes no such restriction. It speaks only of the time of approval, not the time an indebtedness is incurred or accrues.

Here we are not concerned with open-ended voter approval, given before Proposition 13, to incur any government expense deemed desirable from year to year and to tax accordingly. Pursuant to statutory authority the San Gabriel voters authorized a levy for a narrowly defined purpose that necessarily would give rise to payment obligations in the future.

encompasses "obligations which are yet to become due as [well as] those which are already matured." (*Provident etc. Assn.* v. *Davis* (1904) 143 Cal. 253, 255 [76 P. 1034].) ▪ We hold that indebtedness as traditionally understood covers obligations arising under City's pension plan.

Plaintiff and taxpayers argue that subdivision (b) limits the kinds of indebtedness exempted, since it applies only to "interest and redemption charges." Interest routinely is defined as compensation for the use or forbearance of money. (E.g., Civ. Code, § 1915.) ▪ Redemption often means "the act of buying back or repurchasing"; it may connote "a change of interest in the thing to be redeemed," implying that "there is something to be redeemed, 'something lost to be gotten back.' [Citations.]" (*Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 802-803 [249 P.2d 241].) Usually it suggests repurchase or retrieval of a security—whether evidence of indebtedness or tangible or intangible property—by paying the obligation secured.

Yet redemption, like indebtedness, is not fixed or inflexible; its meaning derives from context. It has been defined broadly as "[t]he payment of principal and unpaid interest on bonds *or other debt obligations.*" (Black's Law Dict. (5th ed. 1979) p. 1149, italics added.)[7]

▪ Plaintiff suggests that the phrase "interest and redemption charges" shows an intent to limit the indebtedness protected by subdivision (b) to bonded or secured debt. Article XIII A does not, though, use these well-known limitations on the term "indebtedness." (See, e.g., Gov. Code, § 43605 [limiting certain debt for public improvements; indebtedness defined as "bonded indebtedness"].) Rather it speaks of "*any* indebtedness approved by the voters." (Italics added.) (See *County of Shasta, supra,* 106 Cal.App.3d 30, 39; compare, e.g., Cal. Const., art. XVI, § 18 [distinguishing "any indebtedness (incurred) in any manner or for any purpose" from "indebtedness in the form of general obligation bonds"].)

▪ Courts construe constitutional phrases liberally and practically; where possible they avoid a literalism that effects absurd, arbitrary, or unintended results. (*Amador Valley Joint Union High Sch. Dist.* v.

---

[7]According to Webster's, "redeem" means, among other things, to "remove the obligation of by payment" and to "make good (a promise or pledge): FULFILL...." "Redemption" is defined as including the "act of buying back *or redeeming*" (italics added) and "the removal of an obligation by paying...." (Webster's New Internat. Dict. (3d ed. 1961) p. 1902.)

*State Bd. of Equalization* (1978) 22 Cal.3d 208, 244-245 [149 Cal.Rptr. 239, 583 P.2d 1281], and cases cited.) ▇▇▇ Subdivision (b)'s focus on voter approval implies a concern that irrevocable, long-term obligations, solemnly approved by local electorates and entered on faith in taxing powers then available, not be frustrated by a revolutionary tax limitation imposed from outside the community. (Cf. *Los Angeles County Transportation Com.* v. *Richmond* (1982) *ante*, pp. 197, 202-204 [182 Cal.Rptr. 324, 643 P.2d 941].) It also implies a recognition that failure to create a "prior debt" exception might lead to problems under the federal contract clause. (See *County of Shasta, supra*, 106 Cal.App.3d 30; see also, discussion *post*, pp. 332-333.)

As we have seen, "any indebtedness" can include all obligations to pay money, whether or not evidenced by bonds, notes, or security. We should not assume that the phrase "interest and redemption charges" is a hypertechnical, arbitrary category meant to protect some, while excluding other, "indebtedness [previously] approved by the voters." In the context of subdivision (b), we conclude, "interest and redemption charges" denotes no more or less than the sums from time to time necessary to avoid default on obligations to pay money, including those for pensions.[8]

The most pertinent Court of Appeal precedents reject the notion that subdivision (b) applies only to borrowed funds or bonded debt. In *Kern County Water Agency* v. *Board of Supervisors* (1979) 96 Cal.App.3d 874 [158 Cal.Rptr. 430], a district sought levy of a special 1978-1979 property tax to pay charges due under contract with the Department of Water Resources (Department) for allocations from the State Water Project (Project). The tax was intended to make up deficits remaining after the district's resale of water. The contract with the Department, and levy of a tax necessary to fulfill it, had been approved by the voters before article XIII A became effective.

Bonds for the Project were payable primarily from the Department's sales. The tax sought involved only 20 percent of the district's obligation to the Department, while 60 percent of the Department's revenues went to amortizing the bonds. The Court of Appeal therefore concluded that the entire district levy, ostensibly sought to pay a contract obliga-

---

[8] In light of our previous discussion (*ante*, pp. 326-327), it makes no difference whether the sums are payable to pensioners directly or are due as contributions to a pension system designed to defray such liabilities as they arise. In either case, they are "sums from time to time necessary to avoid default on obligations to pay money."

tion for water, was "necessary" to meet "interest and redemption charges" on "bonded indebtedness" approved by the voters. (P. 879.)

A more recent decision, *County of Shasta, supra*, 106 Cal.App.3d 30, discusses subdivision (b) at length. There the voters in five counties approved a new joint junior college district to supersede a three-county district. Under statutes then in effect the new district elected to keep the college's facilities in the old district's name and not to assume its bonds. However, the voters in each new-district county authorized an annual use charge—payable to the old district from a special new-district property tax—to defray bond obligations. Once article XIII A went into effect, Trinity County refused to levy its tax or pay its use charge. The other district members sought mandate.

As in *Kern County*, the Court of Appeal stressed the connection with "bonded indebtedness" and held that the new-district levy was exempt under subdivision (b). It noted, though, that "'indebtedness' and 'bonded indebtedness' are not synonymous" and that subdivision (b) excludes "*any* indebtedness approved by the voters. The choice of the broader, more flexible term over the more narrow and restrictive term indicates that the voters did not intend to limit subdivision (b) to bonded indebtedness . . . ." (P. 39 of 106 Cal.App.3d.) The aim of subdivision (b), the court concluded, "was to prevent the impairment of contracts approved by the voters in reliance upon the power of the district to levy the tax necessary to fulfill that contract. [Citation.] . . ." (P. 40.)

Plaintiff calls our attention to Revenue and Taxation Code sections 2260 and 2270, property-tax limitation statutes in effect at the time article XIII A was drafted. They exempted certain "interest and redemption charges on bonded or other indebtedness" (§§ 2260 and 2270, subds. (1), (2)) and also the cost of "retirement and pension benefits or plans. which are being provided pursuant to provisions of a city or county charter or which have been specifically approved by the voters of a local agency . . ." (subd. (5)).[9]

---

[9]Section 2260 provides: "The maximum property tax rates for local agencies shall be those established pursuant to the provisions of this article or of Article 6, 7 or 8 of this chapter (commencing with Section 2201) and shall exclude the following from the determination thereof: (1) any property tax rate levied to pay the cost of interest and redemption charges on bonded or other indebtedness which was authorized prior to the effective date of this section, together with any reserve or sinking funds required in connection therewith; (2) any property tax rate levied to pay the cost of interest and redemption charges on bonded or other indebtedness which was authorized after the effective date of this section by the voters of such agency, together with any reserve or

Plaintiff suggests that similarities and differences in the statutory and constitutional provisions are intentional. They show, he urges, that article XIII A's drafters intended to distinguish pension costs from debt redemption, preserving the exemption for the latter but repealing it as to the former.

We disagree. Except for pensions (subd. (5)) and school taxes (subd. (8)), sections 2260 and 2270 speak narrowly of redemption costs for "bonded or other indebtedness" (subds. (1), (2)) and other costs associated with bond financing (subds. (3), (4), (6), (7)). The constitutional replacement eliminates those complexities and extends the exemption to redemption costs for "any" voter-approved indebtedness. No distinction for bonds or pensions is articulated. Plaintiff's theory may be plausible, but more persuasive is the view that article XIII A merely simplifies and broadens the exemption.

Plaintiff points out that the voters' pamphlet analysis of Proposition 13 by the Legislative Analyst described the exemption as applying only to bonded debt. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 6, 1978) p. 57.) Election materials may be helpful but are not conclusive in determining the probable meaning of initiative language. (*Amador Valley, supra*, 22 Cal.3d 208, 246.) The analyst's view is contradicted by the Attorney General's official title and summary, which report that the tax rate is limited "except to pay *indebtedness* previously approved by voters."

---

sinking funds required in connection therewith; (3) any property tax rate levied to pay the cost of interest charges on notes of a local agency issued in anticipation of bonds, if such bonds were authorized prior to the effective date of this section or were authorized by the voters of such agency after the effective date of this section, and if the principal amount of any such notes is payable only from proceeds of the sale of such bonds; (4) any property tax rate levied to pay the cost of interest and redemption charges on refunding bonds or on bonds issued pursuant to Section 53541 of the Government Code or Section 71960 of the Water Code, together with any reserve or sinking funds required in connection therewith; (5) any property tax rate levied to pay the cost of retirement and pension benefits or plans which are being provided pursuant to provisions of a city or county charter or which have been specifically approved by the voters of a local agency; (6) any property tax rate levied to pay the cost of payments or contributions which are required to be made to a special fund by specific provision of a city or county charter; (7) any property tax rate levied pursuant to a city charter procedure ordinance for the purpose of paying principal and interest on assessment bonds or for the purpose of paying annual costs of maintenance and operation of improvements financed pursuant to city charter procedure, when the levy is made in relation to benefits derived and not in accordance with the last equalized city or county assessment roll; and (8) any property tax rate levied on behalf of a county superintendent of schools."

In substantially identical language, section 2270 authorizes local agencies to levy special taxes for purposes exempted from the tax limit by section 2260.

(Ballot Pamp., *supra*, at p. 56, italics added.) The initiative's phrase "any indebtedness" casts further doubt on the analyst's interpretation. We should not assume that his brief comments accurately reflected the full intent of the drafters or the understanding of the electorate.[10]

On the other hand, in *Amador Valley* we stressed the deference to be accorded the Legislature in resolving definitional gaps in article XIII A. (22 Cal.3d at p. 246; see also *State of South Dakota* v. *Brown* (1978) 20 Cal.3d 765, 777 [144 Cal.Rptr. 758, 576 P.2d 473]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) In 1978, soon after passage of Proposition 13, the Legislature enacted Revenue and Taxation Code section 2237, designed to clarify assessment and allocation of taxes under the new constitutional limitation. (Stats. 1978, ch. 292, § 31, p. 609, as amended.)

Section 2237 provided for a single ad valorem tax of 1 percent or less, levied by each county and distributed among all local agencies. No other local agency was to levy a property tax, except for certain purposes including "annual payments for the interest and principal on general obligation bonds or other indebtedness approved by the voters prior to July 1, 1978 [art. XIII A's effective date]." (Subd. (a).)

In 1979 the Legislature adopted section 2237.1. (Stats. 1979, ch. 941, § 1, p. 3245.) That statute declared that the term "indebtedness approved by the voters prior to July 1, 1978," as used in section 2237, subdivision (a), included "city charter provisions which were approved by the voters prior to July 1, 1978, which require a city to levy additional property taxes to pay obligations under the retirement system for city employees," up to the level of benefits approved by voters before that date.

Section 2237 was recodified in 1980 as section 93, subdivision (a). (Stats. 1980, ch. 1256, §§ 1.5, 11.3, pp. 4246, 4252.) Section 2237.1, on the other hand, expired by its terms after the 1979-1980 fiscal year (Stats. 1979, ch. 941, *supra*, § 3, p. 3245). Moreover, the Legislature had stated that adoption of section 2237.1 was intended to extend emer-

---

[10]A letter to us from Howard Jarvis urges that the subdivision (b) exemption be construed narrowly to exclude pensions. To the extent this was an after-the-fact declaration of intent by a drafter of Proposition 13, it may deserve some consideration (see *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 [167 Cal.Rptr. 584, 615 P.2d 1372]); but by no means does it govern our determination how the voters understood the ambiguous provisions.

gency relief, not as an interpretation "whether retirement system obligations are, or are not, intended to be considered 'voter approved indebtedness' within the meaning of Article XIII A of the California Constitution." (*Id.*, § 6.)

It was also stated, however, that section 2237.1 was an emergency statute, "necessary for the immediate preservation of the public peace, health, or safety." The Legislature acted in recognition that "[c]harter cities throughout the state are being impaired in their normal responsibilities and functions" due to tax impounds arising from restrictive interpretations of the tax limit and that "[t]he intent of Article XIII A . . . is not clear." (*Ibid.*)

The Legislature is presumed to adopt constitutional laws. (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204].) Its commendably prompt decision to clarify pension rights, even as a transitional measure, suggests its view that the voters did not intend to disrupt those important, voter-approved obligations.

Finally, City and amici urge that article XIII A, if construed to repeal City's special pension tax, might so impair pension rights as to violate the federal contract clause. (U.S. Const., art. I, § 10, cl. 1.) Substantial issues of that nature indeed are present.

Cases have held that when a municipality was authorized to contract and to levy a corresponding tax, the tax power could not be revoked until the contract was fulfilled. (See *Hubert* v. *New Orleans* (1909) 215 U.S. 170, 175-176 [54 L.Ed. 144, 147-148, 30 S.Ct. 40]; *Wolff* v. *New Orleans* (1881) 103 U.S. 358, 365 [26 L.Ed. 395, 398]; *Von Hoffman* v. *City of Quincy* (1867) 71 U.S. (4 Wall.) 535, 554 [18 L.Ed. 403, 410] (acknowledged in *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 21, fn. 17 [52 L.Ed.2d 92, 108, 97 S.Ct. 1505]); see also *Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App. 3d 545, 549-550 [169 Cal.Rptr. 391]; *County of Shasta, supra,* 106 Cal.App.3d 30, 40.) This court has said that "[t]he pension provisions of a city charter or ordinance form an integral part of the employment contract." Where feasible they should be construed as providing adequate funds to meet employees' reasonable expectations. (*Bellus* v. *City of Eureka, supra,* 69 Cal.2d 336, 351.)

We need not decide here how the contract clause might apply to hypothesized facts. (See, e.g., *Amador Valley, supra,* 22 Cal.3d 208,

240-241.) Rather we adopt a reasonable interpretation of subdivision (b) that "avoids the constitutional issue inherent in a contrary construction." (*Department of Corrections* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 197, 207 [152 Cal.Rptr. 345, 589 P.2d 853].) We conclude that subdivision (b) exempts from the article XIII A tax limitation the voter-approved tax to fund City's pension commitments.[11]

Plaintiff argues that such a holding could create a "nonuniform" scheme of taxation, fortuitously protecting only those pension plans authorized by a vote of the public, though voter approval never was required. (See § 20460; former §§ 20532, 45311.) As we have seen, there is a basis for distinguishing voter-approved debt. (See discussion *ante*, at p. 328; see also Rev. & Tax. Code, §§ 2260, subd. (5), 2270, subd. (5), *supra*.) In any event, in a single case we cannot resolve all article XIII A's anomalies. (*Amador Valley, supra*, 22 Cal.3d at pp. 245-247.) Nor need we decide how pension taxes authorized only by the governing body of a local agency might be treated. Here we conclude only that section 1, subdivision (b) of article XIII A exempts from the tax limit those pensions and corresponding tax levies approved by the voters before the limitation became effective.

### IS THE LEVY A PROHIBITED "SPECIAL ... AD VALOREM [TAX] ON REAL PROPERTY" (ART. XIII A, § 4)?

Plaintiff suggests that regardless of section 1, subdivision (b), the 1978-1979 pension levy was illegal under section 4 of article XIII A.[12] That section permits "Cities, Counties, and special districts" to impose "special taxes" from nonproperty sources when two-thirds of the voters approve, but it prohibits them from levying any "special ... ad valorem taxes on real property."

---

[11] It might be argued that contract clause problems do not arise as to employees hired after the effective date of article XIII A, since they perhaps did not enter service in reliance on City's power to levy the special tax. Yet we see no reason to carve an exception for such persons. We may not assume that subdivision (b) sought to force local governments to the complex calculations necessary to separate their obligations to pre- and post-1978 employees. Article XIII A exempts "interest and redemption charges on any indebtedness previously *approved* by the electors." San Gabriel's voters in 1948 obviously understood that subsequently hired employees too would be covered.

[12] Section 4 provides: "Cities, Counties, and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County, or special district."

Even if City's pension levy is a "special tax" on real property, section 4 cannot be construed to preclude taxes that section 1, subdivision (b), exempts from the constitutional ceiling; i.e., those necessary to pay "interest and redemption charges on any indebtedness [previously] approved by the voters." Since subdivision (b) of section 1 exempts City's property levy for pensions, section 4 does not proscribe it.

## CONCLUSION

We realize that Proposition 13 was a stern tax-cutting measure, intended to prescribe fiscal responsibility and ease the tax burden on residential and business property. Our ruling suggests no elusive deviation from that principle. It provides no authority for governments to tax beyond the set limit for their day-to-day expenses. It simply recognizes that the indebtedness for which article XIII A expressly allows added taxation includes the important obligations cities incurred when, with specific tax authority provided by the voters before July 1, 1978, they instituted pension plans for their employees.

The judgment is affirmed.

Bird, C. J., Mosk, J., Richardson, J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

Appellant's petition for a rehearing was denied June 17, 1982, and the opinion was modified to read as printed above.