Filed 12/30/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAMUEL HECKART, | D066831 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00042315-CU-BT-CTL) |
| A-1 SELF STORAGE, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, John Meyer, Judge. Affirmed.

Finkelstein & Krinsk and William R. Restis, for Plaintiff and Appellant.

Sheppard Mullin Richter & Hampton and John T. Brooks, for Defendants and Respondents for A-1 Self-Storage, Caster Group, Caster Properties, Inc. and Caster Family Enterprises, Inc.

Wilson, Elser, Moskowitz, Edelman & Dicker, John R. Clifford and David J. Aveni, for Defendant and Respondent Deans & Homer.

In this case, we conclude an addendum to a storage unit rental agreement, which modified the agreement's allocation of liability for damage or loss to stored property, was not "insurance" subject to regulation under Article 16.3 of the Insurance Code concerning

self-service storage agents. Rather, the addendum was dependent on the rental agreement whose principal object was the rental of storage space. Thus, the storage facility that offered the addendum did not engage in the unlicensed sale of insurance.

Samuel Heckart brought this action against A-1 Self Storage, Inc. (A-1), Caster Properties, Inc., Caster Family Enterprises, Inc., Caster Group LP (Caster Group), and Deans & Homer (together, Defendants) for violations of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (the UCL)), violations of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq. (the CLRA)), negligent misrepresentation, and civil conspiracy. Heckart alleged A-1's sale of a Customer Goods Protection Plan (the Protection Plan) in connection with its rental of storage space constituted unlicensed sale of insurance. The trial court sustained Defendants' demurrer to Heckart's first amended complaint without leave to amend, concluding the Protection Plan was not insurance. Heckart appeals, contending his allegations are sufficient to state the asserted causes of action because the Protection Plan is insurance that must comply with the Insurance Code. We find his arguments unavailing and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A-1 operates storage facilities in California. Caster Properties, Inc., Caster Family Enterprises, Inc., and Caster Group have ownership, operation or management interests in A-1.

In June 2012, Heckart rented a storage unit from A-1. He signed A-1's standard rental agreement (the Rental Agreement), which set out the basic terms of the rental. The Rental Agreement provided:

2

"11. INDEMNITY: Tenant(s) does hereby Indemnify and hold harmless Landlord from any loss by reason of injury or damage to person or property, from whatever cause, all or in part connected with the condition or use of the premises. . . .

"12. INSURANCE: Tenant, at Tenant's expense, shall maintain a policy of fire, extended coverage endorsement, burglary, vandalism and malicious mischief insurance for the actual cash value of stored property. Insurance on Tenant's property is a material condition of this agreement and is for the benefit of both Tenant and Landlord. Failure to carry the required Insurance is a breach of this agreement and Tenant assumes all risk of loss to store property that would be covered by such Insurance.

"[¶] . . . [¶]

"19. CUSTOMER GOODS PROTECTION PLAN: If Tenant(s) elects to participate in [the Protection Plan], those provisions in this rental agreement concerning landlord's liability which are modified by [the Protection Plan] are considered never to have been in effect."

The Protection Plan reiterated terms of the Rental Agreement, including that the tenant assumed the sole risk of loss or damage to stored property, A-1 was not liable for loss or damage to stored property, and the tenant must insure his or her stored property. The Protection Plan stated, however, that for an additional payment of $10 per month, A-1 would retain liability for loss of or damage to the tenant's stored property up to $2,500 for losses caused by fire, explosion, smoke, theft, vandalism, malicious mischief, roof leak, water damage, vandalism, or collapse of the building where the property was stored. The Protection Plan went on to state that, if elected, "[t]his limited acceptance of liability is a modification to the waiver of liability in paragraph eleven (11) of the rental agreement that it forms a part of. It satisfies the insurance requirement stated in paragraph twelve (12)."

3

The form Protection Plan required the tenant to either initial to accept or decline participation in the plan. Heckart declined participation by initialing that option, which provided: "No, I decline participation in the . . . Protection Plan. I am currently covered by an insurance plan that covers my belongings in the storage facility. I understand that I need to provide the policy information in writing to the facility Owner within 30 days or I will automatically be enrolled in the . . . Protection Plan until I do provide such information to the Owner." Heckart "inadvertently" purchased the Protection Plan and was enrolled in it, presumably because he failed to provide proof of insurance within 30 days.

Deans & Homer is an insurance underwriter, agent and broker licensed to sell insurance by the California Department of Insurance (DOI). Deans & Homer provided A-1 with the template for the Protection Plan agreement and forms, policies, and procedures needed to implement the Protection Plan. It also sold A-1 a Storage Operator's Contract Liability Policy (Storage Liability Policy) that covered A-1's Protection Plan losses. For a premium of $0.74 per month for each Protection Plan participant, Deans & Homer assumed liability for all of A-1's Protection Plan losses over $250,000 per year. Deans & Homer also retained the right to adjust Protection Plan claims directly with plan participants.

In April 2013, Heckart, on behalf of himself and other similarly situated California residents, sued A-1 and Caster Group for violations of the UCL and CLRA. He alleged A-1 and Caster Group engaged in unfair, unlawful and deceptive sale of unlicensed

4

insurance in conjunction with the rental of storage units. A-1 and Caster Group demurred to the complaint. The trial court sustained the demurrer with leave to amend.

Heckart amended his complaint, adding Deans & Homer and the other Caster entities as defendants. He alleged causes of action for violations of the UCL and CLRA, negligent misrepresentation, and civil conspiracy. Heckart's allegations were premised on the notion that A-1's Protection Plan was an unlicensed and illegal insurance policy. Heckart alleged the Protection Plan's automatic enrollment after 30 days if the tenant did not provide proof of insurance was deceptive to a reasonable consumer, causing class members to be "enrolled in an illegal insurance plan that is not properly disclosed as such, is sold in an illegal and misleading manner, and costs more but provides less coverage than other self-storage insurance," including a policy offered by Deans & Homer.

Defendants demurred to Heckart's amended complaint, arguing it failed because the Protection Plan did not transform the Rental Agreement into insurance. Rather, the Protection Plan was tangential to the principal object of the transaction between Heckart and A-1, which was rental of storage space. The trial court sustained the demurrer without leave to amend, concluding the principal object of the transaction between Heckart and A-1 was rental of a storage unit, not the sale of insurance. Thus, each cause of action failed because the Protection Plan was not a contract of insurance.

In conjunction with the order sustaining Defendants' demurrer to the amended complaint, the trial court granted Defendants' request for judicial notice of multiple documents, including a letter from Deans & Homer to the DOI and two letters from the

DOI to Deans & Homer. Deans & Homer's letter to the DOI requested an opinion on whether a program structured like the Protection Plan would be subject to regulation as insurance. The DOI's 2003 response letter opined that the DOI "did not believe that such contracts between landlords and tenants are insurance contracts for purposes of statutory regulation. The primary purpose of the contract is rental of the premises. The parties appear to be allocating the risk by contractual agreement. For an additional amount of rent, the risk of damage for a particular risk shifts from the lessee to the lessor." In a 2008 letter, the DOI confirmed the opinion it expressed in its 2003 letter.

DISCUSSION

I. *General Legal Principles*

A. Insurance Principles

"Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22; undesignated statutory references are to this code.) "Thus, insurance necessarily involves two elements: (1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons." (*Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 654 (*Metropolitan Life*).) However, "the mere fact that a contract contains these two elements does not necessarily mean that the agreement constitutes an insurance contract for purposes of statutory regulation. [¶] 'A statute designed to regulate the business of insurance . . . is not intended to apply to all organizations having some element of risk assumption or distribution in their operations. The question of whether an arrangement is

6

one of insurance may turn, not on whether a risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose." (*Truta v. Avis Rent A Car System, Inc*. (1987) 193 Cal.App.3d 802, 812 (*Truta*).)

In 2004, California added Article 16.3 to the Insurance Code, which regulates self-service storage agents. (Added by Stats. 2004, ch. 428 (A.B. 2520), § 3.) Under that statutory scheme, "[n]o self-service storage facility, or franchisee of a self-storage facility, shall offer or sell insurance unless it has complied with the requirements of [Article 16.3] and has been issued a license by the commissioner as provided in [that] article." (§ 1758.7, subd. (a).) Licensed self storage facilities or their franchisees may offer or sell "hazard insurance coverage to renters for the loss of, or damage to, tangible property in storage or in transit during the rental period" "in connection with, and incidental to, self-service storage rental agreements." (§§ 1758.7, subd. (b), 1758.75, subd. (d).)

The licensee must provide prospective renters with written materials that summarize the material terms and conditions of coverage, describe the process of filing a claim, disclose information on price, benefits, exclusions, conditions, or other limitations, and provide specified information about the licensee and the availability of the DOI's consumer hotline. (§ 1758.76, subd. (a).) Additionally, the self-service storage agent must disclose that the purchase by the renter of insurance is not required to rent storage space, that the insurance policies offered by the self-service storage agent may duplicate the renter's homeowner's insurance or other coverage, and the self-storage facility is not

7

qualified or authorized to evaluate the renter's existing coverage.  (§ 1758.76, subd. (b).)  The insurance offered or sold by a self-storage facility must be "provided under an individual, a group, or a master policy issued to the self-service storage agent by an insurer authorized to write [that] type[] of insurance."  (§ 1758.76, subd. (d).)  The Insurance Code does not prevent a storage facility from including a provision in its rental agreement "requiring the renter to provide insurance on his or her property in the storage unit."  (§ 1758.76, subd. (b)(1).)

B.  Standard of Review

" ' "On appeal from an order of dismissal after an order sustaining a demurrer, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." ' "  (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 650.)  "A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground."  (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)  In reviewing the complaint, "we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable."  (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.)

"To the extent issues of statutory interpretation are raised, we apply the rules of statutory construction and exercise our independent judgment as to whether the complaint states a cause of action.  [Citation.]  Our first task in construing a statute is to ascertain the Legislature's intent in order to carry out the purpose of the law.  If the statutory

8

language is clear and unambiguous, no judicial construction is required. If the statute is ambiguous, the words must be construed in context in light of the statutory purpose." (*Doe v. Doe 1* (2012) 208 Cal.App.4th 1185, 1188-1189.)

## II. *Analysis*

### A. The Protection Plan Is Not Insurance

Heckart argues the trial court erred in ruling the Protection Plan is not insurance subject to regulation under the Insurance Code. Based on the premise that the Protection Plan is insurance, Heckart contends he properly stated causes of action for violation of the UCL, negligent misrepresentation, and civil conspiracy. We reject Heckart's arguments.

In general, insurance requires shifting one party's risk of loss to another party and distributing that risk among similarly situated persons. (*Metropolitan Life*, *supra*, 32 Cal.3d at p. 654.) However, not all contracts satisfying these two elements constitute insurance. We must look to the "principal object and purpose of the transaction" to determine whether it is a contract of insurance. (*Truta*, *supra*, 193 Cal.App.3d at p. 814.) Thus, we consider whether the Protection Plan's principal object was risk shifting and distribution.

In *Truta*, the class plaintiffs challenged a provision in a standard car rental contract providing that for a fee, the rental company would agree to bear the cost of any damage to the vehicle. (*Truta*, *supra*, 193 Cal.App.3d at p. 807.) Plaintiffs argued that this provision converted the transaction into one of insurance and thus the defendants were required to comply with insurance statutes. (*Id*. at pp. 807-808, 812.) Rejecting this

9

argument, the *Truta* court reasoned that the "principal object and purpose of the transaction" and "the element which gives the transaction its distinctive character" was the rental of an automobile, and not this incidental benefit offered to consumers. (*Id*. at p. 814.)

We find *Truta* on point and persuasive. The Protection Plan in this case was an addendum to and dependent upon the Rental Agreement. Without the Rental Agreement, the Protection Plan would not exist and would have no purpose. Thus, we must look at the Rental Agreement and Protection Plan as a whole. Looking at the entire transaction between the parties, the principal object or "distinctive character" was the rental of storage space.

The Rental Agreement allocated the risk of property damage and loss to the tenant. Tenants were free to choose that option. Alternatively, for an additional fee of $10 per month, tenants could choose to enter into the Protection Plan, which allocated risk to A-1. If the tenant chose to participate in the Protection Plan, it modified paragraphs 11 and 12 of the Rental Agreement, which concerned indemnity and the tenant's obligation to maintain insurance on his or her stored property. Just as the parties were free to contract to allocate risk to the tenant, they were also free to allocate risk to A-1. Allowing parties to shift the risk of property damage does not turn an agreement, whose primary objective is storage rental into insurance.

Additionally, we note that contrary to Heckart's argument, the Storage Liability Policy between A-1 and Deans & Homer does not suggest the Protection Plan is insurance. Heckart contends A-1 collected unlawful commissions from Deans & Homer

10

because A-1 charged tenants $10 per month and paid Deans & Homer $0.74 per Protection Plan participant, which amounted to A-1 earning over $8 million in "commissions" from Deans & Homer during the class period. Nothing in the Protection Plan or Storage Liability Policy indicates that Deans & Homer paid A-1 commissions. Rather, the Storage Liability Policy was an insurance policy that A-1 purchased from Deans & Homer to cover the losses it would have to pay participants under the Protection Plan. A-1 was not required to purchase the Storage Liability Policy from Deans & Homer as a condition of offering tenants the Protection Plan option to the Rental Agreement. Instead, A-1 was free to accept responsibility for loss or damage to the property of Protection Plan participants. The Storage Liability Policy simply provided a way for A-1 to limit its exposure.

Heckart further argues A-1 violated the Insurance Code in regard to training its employees (§ 1758.72) and providing tenants with written disclosures about filing claims, duplication of coverage, employees' abilities to evaluate a tenant's existing coverage, and that purchase of the Protection Plan was not required to rent storage space (§ 1758.76). Heckart's argument fails because it puts the cart before the horse. The requirements of Article 16.3 of the Insurance Code only apply if the Protection Plan is insurance. This is clear from the statutory language. For example, section 1758.7 provides that a self-service storage facility shall not "*offer or sell insurance* unless it has complied with the requirements of [Article 16.3]." (§ 1758.7, subd. (a), italics added.) Similarly, a self storage facility "*shall not sell insurance* pursuant to [Article 16.3]" unless it provides required written materials and disclosures. (§ 1758.76, italics added.) Thus, the

11

requirements of Article 16.3 only come into play if the self storage facility is selling insurance.

"We also give deference to the [DOI's] interpretation of the Insurance Code." (*Truta*, *supra*, 193 Cal.App.3d at p. 814.) Deans & Homer requested an opinion from the DOI as to whether a program structured substantially similar to the Protection Plan constituted insurance. In 2003, the DOI opined that such programs were not insurance for purposes of statutory regulation because the primary purpose of the contract was real property rental. In 2008, which was after the enactment of Article 16.3 of the Insurance Code, the DOI confirmed its 2003 opinion.

Heckart claims the DOI's opinion is not entitled to deference because Deans & Homer did not accurately describe the Protection Plan program to the DOI. First, he claims Deans & Homer failed to disclose that self-storage facilities would pay claims. Contrary to Heckart's argument, Deans & Homer's letter makes clear that the property owner "would retain or assume liability for various types of risks" and "[a]ny commitment to retain risk made to the tenant would be made by the owner only." Based on this language, Deans & Homer disclosed that property owners, such as storage facilities, would pay claims to tenants.

Heckart also argues Deans & Homer failed to disclose a "pass through of risk" under the Storage Liability Policy between Deans & Homer and A-1. However, Deans & Homer accurately disclosed to the DOI that the program "would not be a transaction between the tenant and any insurer or even a pass through of risk from the tenant to the insurer." We do not find anything misleading in this representation. As we previously

12

discussed, the Storage Liability Policy was simply an insurance policy that A-1 purchased to cover its potential losses and was not required as a condition of offering tenants the option to enroll in the Protection Plan. Moreover, Deans & Homer disclosed to the DOI that property owners had the option of purchasing coverage from Deans & Homer.

It is clear from the DOI's opinion letters that it does not believe that the Insurance Code regulates programs such as the Protection Plan. "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." (*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837, 844, fn. omitted.) Based on our analysis of the Protection Plan and statutory scheme upon which Heckart relies, we see no reason to depart from the DOI's opinion in that regard.

Based on the foregoing, we conclude the Protection Plan is not insurance subject to regulation under the Insurance Code.

B. Heckart's Claims

1. UCL, Negligent Misrepresentation, and Civil Conspiracy

Heckart's UCL, negligent misrepresentation, and civil conspiracy causes of action were all premised on his allegation that the Protection Plan is insurance. Specifically, his UCL claim alleged Defendants' sale of unlicensed and illegal insurance and failure to comply with the Insurance Code constituted unfair and unlawful business practices within the meaning of the UCL. Similarly, in his negligent misrepresentation cause of

13

action, Heckart alleged Defendants misrepresented that the Protection Plan is not a contract of insurance. Lastly, in his civil conspiracy claim, Heckart alleged Defendants conspired to sell the Protection Plan in a manner calculated to avoid regulation under the Insurance Code.

Because the UCL, negligent misrepresentation, and civil conspiracy causes of action are all dependant on the allegation that the Protection Plan is insurance and we have concluded it is not, the trial court properly sustained Defendants' demurrer as to those causes of action.

2. CLRA

In his first amended complaint, Heckart alleged Defendants violated the CLRA by failing to represent the Protection Plan is insurance, representing that purchase of the Protection Plan is required, and imposing an unconscionable contract on class members by requiring enrollment in an illegal insurance policy. On appeal, Heckart recognizes that the CLRA does not apply to insurance contracts, but argues his CLRA cause of action should survive because the CLRA applies to misrepresentations about the Protection Plan contained in the Rental Agreement. We reject Heckart's argument.

The CLRA prohibits unfair or deceptive acts that "result[ ] in the sale or lease of goods or services to any consumer . . . ." (Civ. Code, § 1770.) The CLRA defines "[s]ervices" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." (Civ. Code, § 1761, subd. (b).) Insurance does not constitute a "service" for purposes of the CLRA. (*Fairbanks v. Superior Court* (2009) 46 Cal.4th 56, 62-63 (*Fairbanks*).) The CLRA must

14

"be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."  (Civ. Code, § 1760.)

In order to prove his CLRA cause of action as he framed it in his first amended complaint, Heckart would need to establish that the Protection Plan was insurance.  Even if he could prove that, which he cannot, a transaction involving the sale of insurance is exempt from the CLRA.  (*Fairbanks*, *supra*, 46 Cal.4th at pp. 62-63.)  Recognizing this hurdle, Heckart contends the CLRA applies to the Rental Agreement because storage rental is a "service" within the meaning of the CLRA.

The CLRA applies to the "sale or lease of goods or services."  (Civ. Code, § 1770.)  In this case, the Rental Agreement was for the lease of real property, which is not a "good" or "service."  (See *McKell v. Washington Mutual, Inc*. (2006) 142 Cal.App.4th 1457, 1465-1467, 1488 [the CLRA does not apply to a transaction resulting in the sale of real property].)  Heckart contends the Rental Agreement is for "services" because it "requires A-1 to provide both security and availability services."  The fact that A-1 agreed to provide "security and availability" services was ancillary to the main purpose of the Rental Agreement, which was lease of storage space, and does not transform the agreement into one for the sale or lease of "services" within the meaning of the CLRA.

Based on the foregoing, Heckart failed to allege facts sufficient to properly state a CLRA claim.

15

DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


McINTYRE, J.

WE CONCUR:


NARES, Acting P. J.


McDONALD, J.

16